Mark WILLIAMS, Plaintiff,

v.

ASTRA USA, INC., Defendant.

Civil Action No. 98–40190–NMG.

United States District Court,
D. Massachusetts.

Sept. 21, 1999.

Philip M. Giordano, James F. Champa, Giordano & Champa, P.A., Boston, MA, for plaintiff.

Richard L. Alfred, Hill & Barlow, Boston, MA, for defendant.

### MEMORANDUM AND ORDER

GORTON, District Judge.

On September 9, 1998, plaintiff Mark Williams ("Williams") brought this action against his former employer, defendant Astra USA, Inc. ("Astra"), alleging a hostile work environment claim under Title VII of the Civil Rights Act of 1964, as amended, (Count I), constructive discharge/wrongful termination (Count II), breach of contract/estoppel (Count III), breach of implied covenant of good faith and fair dealing (Count IV), intentional infliction of emotional distress (Count V), and negligent infliction of emotional distress (Count VI).

Pending before this Court are 1) a Motion by Astra to dismiss all counts of Williams' complaint or, in the alternative, to strike certain allegations from Williams' complaint (Docket No. 4), and 2) a Motion by Williams for Leave to Amend the Complaint (Docket No. 6).

### I. Factual Allegations

In determining a motion for judgment on the pleadings, this Court must accept all of the non-movant's factual averments as true and draw all reasonable inferences in his favor. *French v. Pan Am Express, Inc.*, 869 F.2d 1 (1st Cir.1989) (citations omitted). Accordingly, the following facts are summarized from the allegations in the complaint and are taken as true for purposes of the present motion. *See Kiely v. Raytheon Company*, 105 F.3d 734, 735 (1st Cir.1997).

Williams is an adult, African–American male residing in the State of Michigan. Astra is a corporation, organized under the laws of the state of New York, with its principal place of business in Massachusetts.

In or about October 1994, Williams participated in Astra's six-week training program for sales representatives. During the training program, a black co-worker, Claude Shelton ("Shelton"), came to the room where Williams was residing and knocked on Williams' door. A white co-worker, assigned as Williams' roommate, answered the door and told Shelton that what he had just done was "nigger-knocking". Williams demanded his roommate stop uttering such racial slurs.

In or about December, 1994, despite his expressed preference to be assigned to the Pittsburgh sales territory, Astra designated Williams as its sales representative in Saginaw, Michigan. According to Williams, Saginaw demographically has few minority residents and is known historically as a region with long-standing hostility and prejudice against African–Americans. Upon publication of the territory assignments, Williams' peers in the Astra training program commented that he would need to get a "coon-skinned" cap to be able to work in Saginaw. The use of

the term "coon-skinned" was offensive to Williams.

According to Williams, he was subjected to hostile and racially discriminatory treatment by, *inter alia*, Astra's current and potential customers, including but not limited to physicians. For instance, in or about 1995, a doctor's wife warned Williams that, because African–Americans were not welcome in Hemlock, Michigan, he should not stop in Hemlock for any reason as his safety would most likely be endangered. She recounted to Williams that certain of her friends expressed that they "hated niggers".

Also, in or about 1995, Williams had a discussion with a doctor, who was an Astra customer, in Carsonville, Michigan and informed Williams to be wary of the local residents who were extremely prejudiced against African–Americans. He also warned Williams not to stop in the area at night as it was not safe for minorities.

Also at that same doctor's office, Williams encountered a patient in the waiting area who stated (in a voice loud enough for Williams to hear) that he wasn't aware that the doctor "allowed niggers" into the office. Furthermore, in or about 1995, Williams was warned by another Astra customer in Owosso, Michigan to be careful because the extreme bigotry and prejudices of the local residents often turned to violence.

In or about July 1996, Williams was verbally assaulted with a torrent of racial slurs as he entered a store in Bad Axe, Michigan. Shortly thereafter, two men approached Williams in a parking lot, told him "niggers" were not allowed in Bad Axe and threatened that he would be physically harmed if they "caught [him] in the area again."

These threats and verbal assaults caused Williams to fear for his well-being and safety. Although he repeatedly brought the racial threats and intimidation to the attention of his supervisors and senior managers at Astra, they did not comply with his requests for assistance or a transfer from the Saginaw sales territory.

Some time around January 1996, Williams was allegedly subjected to pressure from Astra to execute a letter "endorsing" the affirmative action performance of Astra. According to Williams, this endorsement was intended by senior managers to falsely blunt an ongoing investigation by a Business Week reporter into discriminatory employment practices at Astra. During that time, Williams discussed the matter with other African–American employees at Astra and expressed his fear of losing his job if he failed to succumb to Astra's pressure.

Then, on or about January 16, 1996, Williams received a "We, the Minority Representatives of Astra" letter ("the Minorities Letter") from Bill Brown, an African–American employee at Astra. In the Minorities Letter, Astra sought to have Williams endorse the position that the minority employees of the Company were "United and Proud".

> The Minorities Letter stated, *inter alia:*
>
> At Astra the work environment is superior, we [the Minorities at Astra] are all proud to work for a company filled with career advancement and growth. Each one of us are [sic] in complete control of our own destiny. . . .
>
> [W]e believe Astra to be sensitive and interested in our needs and it is our diversity that makes Astra, Astra. We completely agree with Astra's policies, management and philosophies. Being a member of the A–Team is a membership we are all very proud of and will continue to support.

However, it is unclear from the facts pleaded in the complaint whether Williams signed that letter or what adverse employment consequences Williams suffered as a result of his decision to sign or not to sign the letter.

On or about September 23, 1997, Williams was allegedly constructively ter-

minated and left his position at Astra. As a direct consequence of Astra's conduct, acts and omissions, Williams claims to have suffered damages and injuries, including, but not limited to, severe emotional distress and reduced employment opportunities.

## II. Motion to Dismiss

### A. Legal Standard

■ A motion to dismiss for failure to state a claim may be allowed only if it appears, beyond doubt, that the plaintiffs can prove no facts in support of their claim that entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court must accept all factual averments in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B.,* 958 F.2d 15, 17 (1st Cir.1992).

■ While a pleading is typically construed liberally in favor of the complaining party, *see, e.g., Schuler v. United States,* 617 F.2d 605, 608–09 (D.C.Cir.1979), a complaint must allege sufficient facts to provide the defendant "fair notice of the nature of the claim and the grounds upon which it rests." *Washington v. James,* 782 F.2d 1134, 1140 (2d Cir.1986). Indeed, the First Circuit has stated that Rule 12(b)(6) is not entirely "a toothless tiger" and that plaintiffs must set forth "in their complaint factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable legal theory." *The Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989).

Furthermore, with respect to civil rights claims, it is well settled in this Circuit that mere conclusory allegations are insufficient to withstand dispositive motions if no factual support has been provided to the Court. *See, e.g., Johnson v. General Electric,* 840 F.2d 132, 138 (1st Cir.1988) ("Complaints based on civil rights statutes must do more than state simple conclu-

sions; they must at least outline the facts constituting the alleged violation."); *Dewey v. Univ. of New Hampshire,* 694 F.2d 1, 3 (1st Cir.1982) (holding that a plaintiff is not entitled to rest on "subjective characterizations" or conclusory descriptions of "a general scenario which could be dominated by unpleaded facts"); *Christensen v. Lawrence F. Quigley Memorial Hospital,* 656 F.Supp. 14, 16 (D.Mass.1985) ("In civil rights cases, the First Circuit requires a plaintiff to outline specific facts, which if proven would entitle him to relief."). In other words, the alleged facts must "specifically identify the particular instances of discriminatory treatment and, as a logical exercise, adequately support the thesis" of unlawful discrimination. *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 53 (1st Cir.1990) (citing several First Circuit cases).

■ When a claim is dismissed under Rule 12(b)(6), courts customarily allow leave to amend. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991). If a plaintiff has "at least colorable grounds for relief, justice does ... require leave to amend." *Kaster v. Modification Systems, Inc.,* 731 F.2d 1014, 1018 (2d Cir.1984) (internal quotations omitted).

### B. Count I: Title VII Hostile Work Environment Claim

As a basis for dismissal for Count I, Astra argues that Count I should be dismissed because 1) Williams' complaint was not timely filed and 2) the facts, as alleged by Williams in the complaint, are not sufficient to state a hostile work environment claim under Title VII.

#### 1. Timeliness

Prior to filing a Title VII action in federal district court, a plaintiff first must file a timely administrative claim with the Equal Employment Opportunity Commission ("EEOC"). In a "deferral jurisdiction" such as Massachusetts, a Title VII plaintiff must file a complaint with the EEOC with-

in 300 days after the "alleged unlawful employment practice occurred," pursuant to 42 U.S.C. § 2000e–5(e). *See Mohasco Corp. v. Silver*, 447 U.S. 807, 814 n. 16, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980); *see also Mack v. Great Atlantic and Pacific Tea Company, Inc.*, 871 F.2d 179, 181–82 (1st Cir.1989).

██ Here, it is undisputed that Williams' EEOC charge, filed on March 19, 1998, was filed well beyond the 300–day limitation period. Williams argues, however, that the facts of this case present a continuing violation, allowing Williams to sue for acts of discrimination occurring outside the limitation period. *Mack*, 871 F.2d at 182; *Jensen v. Frank*, 912 F.2d 517, 522 (1st Cir.1990).

As the First Circuit has noted, "continuing violations arise in one of two incarnations". *Lawton v. State Mutual Life Assurance Company of America*, 101 F.3d 218, 221 (1st Cir.1996). One "incarnation" takes the form of a serial violation, that is, a violation composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong actionable under Title VII. *Lawton*, 101 F.3d at 221; *see Jensen*, 912 F.2d at 522. "Although the limitations clock generally starts with the commission of a discriminatory act, a true continuing violation rewinds the clock for discriminatory episodes along the way." *Mack*, 871 F.2d at 183.

Here, Williams fails to allege any specific discriminatory conduct occurring during the limitations period. Thus the serial violation doctrine cannot rescue plaintiff's Title VII claim.

Alternatively, a systemic violation is also sufficient to constitute a continuing violation. A systemic violation

has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint.

*Jensen*, 912 F.2d at 523. In other words, where discrimination and injury are ongoing, "the limitations clock does not begin to tick until the invidious conduct ends." *Mack*, 871 F.2d at 183.

Here, Williams argues that the complaint contains allegations of the Defendant's discriminatory policies, practices and procedures which reflect a systemic violation of Title VII. However, Williams fails to allege with sufficient specificity and detail that a particular discriminatory policy or practice engaged in by Astra *continued into, and was in force during, the limitations period*. *See Jensen*, 912 F.2d at 523 (finding a "systemic violation" to exist "so long as the policy or practice itself continues into the limitation period").

In the absence of such allegations, the continuing violation doctrine fails to assist Williams in clearing the limitations hurdle. Therefore, the Title VII claim cannot be deemed to have been timely filed and will be dismissed.

*2. Hostile Work Environment: Sufficiency of Allegations*

Although it is unnecessary to consider, in connection with the Court's decision on the pending motion, Astra argues an additional independent ground for dismissal of Count I. Astra contends that, even if Williams' claim were not time-barred, the facts as alleged in the complaint are insufficient to state a hostile work environment under Title VII. As discussed *infra*, this Court agrees.

██ Title VII of the Civil Rights Act of 1964, as amended, makes it:

an unlawful employment practice for an employer ... to discriminate against an individual with respect to his [/her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a)(1). In order to rise to the level of an actionable Title VII violation under the hostile work environ-

ment theory, the harassment must be "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Morgan v. Massachusetts General Hospital*, 901 F.2d 186, 192 (1st Cir.1990) (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)); *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

### a. Third Party Acts of Discrimination

■ This Court notes that a significant portion of the complaint is devoted to discriminatory acts allegedly committed by third parties, many of whom have no affiliation with Astra. Williams alleges, *inter alia*, that 1) a manager of an apartment complex in Saginaw refused to rent to Williams, Compl. at ¶ 23–24; 2) a member of Williams' gym made racially discriminatory comments, *id.* at ¶ 25; 3) a patient in the waiting room of a physician (who is allegedly a customer of Astra) made racially discriminatory remarks within earshot of Williams, *id.* at ¶ 28; and 4) unidentified persons in a store and parking lot in Bad Axe, Michigan directed racially discriminatory slurs and threats against Williams, *id.* at ¶ 31–32.

Williams maintains that an employer may be held liable for the acts of non-employees, relying on section 1604.11 of the EEOC Guidelines which provides:

> An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.

29 C.F.R. § 1604.11(e). The EEOC provides that the "principles involved [in the quoted guideline] continue to apply to race, color, religion or national origin." *Id.* at n. 1. However, this Court notes that, while these Guidelines "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance," they are *not* controlling. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

Furthermore, most courts which have considered this guideline have done so in the context of sexual harassment claims, not race discrimination. *See, e.g., Equal Employment Opportunity Commission v. Federal Express*, 1995 WL 569446 (W.D.Wash.1995); *McGuire v. Commonwealth of Virginia*, 988 F.Supp. 980 (W.D.Va.1997); *Kudatzky v. Galbreath*, 1997 WL 598586 (S.D.N.Y.1997). In light of the particular facts of this case, this Court is persuaded that Astra should not be held liable under Title VII for the alleged racially discriminatory acts of third parties with whom Astra has no affiliation and over whom Astra had no control or influence.

### b. Alleged Discriminatory Acts by Astra

■ Setting aside the third party acts, Astra maintains that the remaining incidents, as currently alleged in the complaint, are insufficient to constitute a Title VII hostile work environment claim. Whether the racially offensive conduct or practices are sufficiently "severe" or "pervasive" to constitute a Title VII hostile work environment violation is to be determined from the totality of the circumstances. *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *Snell v. Suffolk County*, 782 F.2d 1094, 1102 (2d Cir.1986). These circumstances include the gravity and frequency of the offensive discriminatory conduct, as well as the potential for interfering with the performance of work. *Harris*, 510 U.S. at 23, 114 S.Ct. 367.

Here, Astra argues that Williams alleges only five incidents over a three year tenure with Astra and that those incidents were nothing more than isolated racial slurs insufficient to constitute a Title VII violation. Indeed, courts have held that, to establish a hostile work environment, plaintiffs must prove more than a few isolated incidents of racial enmity. *Snell*, 782 F.2d at 1103 ("Casual comments, or accidental or sporadic conversation, will not trigger [Title VII relief]."); *Nazaire v. Trans World Airlines, Inc.*, 807 F.2d 1372, 1380 (7th Cir.1986) ("It is . . . well settled that occasional or sporadic instances of the use of racial or ethnic slurs do not in and of themselves constitute a violation of Title VII").

Nevertheless, racially derogatory language remains relevant to the overall hostile work environment inquiry. *See Snell*, 782 F.2d at 1102 (2d Cir.1986); *Powell v. Missouri State Highway and Transp. Dep't*, 822 F.2d 798, 801 (8th Cir.1987) ("Racially derogatory language in the workplace can be evidence of a discriminatory atmosphere, and is certainly not to be condoned").

Astra, focusing on the isolated nature of the alleged racial epithets, attempts to downplay the alleged incident of the Minorities Letter, *see supra* Section II. This Court, however, pays particular attention to that letter in weighing the sufficiency of the pleaded facts. Indeed, it is concerned by allegations made by Williams that, in late 1995 and early 1996, Astra sought to pressure African–American employees, including Williams, into falsely endorsing Astra's position on equal opportunity and employment by coercing them into signing the Minorities Letter. The subject letter allegedly contained false statements and was intended by senior managers to blunt

an ongoing investigation into discriminatory employment practices at Astra.

Nevertheless, Williams fails to utilize the potential of the alleged incident to create an actionable Title VII claim because he does not allege that he actually signed the letter. Nor does he allege any adverse employment action or other adverse consequence resulting from the incident. In the absence of such allegations, Williams' Title VII claim cannot survive a motion to dismiss.

### C. State Law Claims

#### 1. Choice of Law

This Court notes that Williams' remaining state law claims involve at least some conduct occurring outside Massachusetts and thus may raise choice-of-law issues. Normally, the first step in applying choice of law principles is to ascertain whether the choice will affect the outcome—in essence, whether there is an actual conflict of laws.[1] *Cohen v. McDonnell Douglas Corp.*, 389 Mass. 327, 332 n. 7, 450 N.E.2d 581 (1983). It is significant that neither party has raised the substantive law of any jurisdiction other than Massachusetts, and for that reason this Court does not opine on the law of Michigan, the only other jurisdiction conceivably involved. Given that the parties did not raise a conflict-of-laws issue, it is deemed that none exists. *See Doricent v. American Airlines, Inc.*, 1993 WL 437670, *8 (D.Mass.).

#### 2. Count II: Constructive Discharge

Treating Count II as a combined claim for constructive discharge and retaliatory discharge, this Court, for the reasons discussed below, concludes that the facts as currently pled in the complaint are insufficient to state a cause of action

---

1. Under *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), this Court must look to Massachusetts choice-of-law rules to determine which jurisdiction's law applies. In turn, *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 632, 473 N.E.2d 662 (1985), holds that Massachusetts courts follow the approach of the Restatement (Second) of Conflict of Laws, § 145(1) (1971), which favors the state with the "most significant relationship" to the parties and events of the case.

under either theory. To find a constructive discharge, the trier of fact "must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977). To succeed on a retaliatory discharge claim, a plaintiff "must establish the basic fact that he was subjected to an adverse employment action because of his protected activity." *Lewis v. Gillette Co.*, 22 F.3d 22, 24 (1st Cir.1994)

Here, the complaint is devoid of any allegation of an adverse employment action by Astra within the last fifteen months of Williams's tenure at Astra. Nor does Williams adequately allege new working conditions attributable to the actions of Astra that could be considered "so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to resign." *Alicea Rosado*, 562 F.2d at 119. With respect to Astra's alleged pressuring of Williams to sign the Minorities Letter, Williams neither alleges that he actually signed the letter nor that any adverse employment action or other adverse consequence resulted from the incident. *See supra* Section III.B. In light of these deficiencies, Count II will be dismissed.

*3. Count III: Breach of Contract/Estoppel*

■ Count III of Williams' complaint alleges that Astra breached its promises and assurances to Williams by 1) failing to correct its improper and unethical business practices or to respond appropriately after notice of racially discriminatory conduct against Williams, 2) creating a hostile work environment toward Williams, and 3) forcing his constructive termination.

■ Under Massachusetts law, to state a breach of contract or estoppel claim, Williams must describe with "substantial certainty" the bargain at issue and the specific obligation or promise breached by Astra. *Pollock v. New England Tel. &*

*Tel. Co.*, 289 Mass. 255, 194 N.E. 133 (1935); *see Doyle v. Hasbro Inc.*, 103 F.3d 186 (1st Cir.1996) (breach of contract claim dismissed where only conclusory statements made). This requirement pertains whether Williams' theory sounds in contract or estoppel. *Rhode Island Hospital Trust Nat. Bank v. Varadian*, 419 Mass. 841, 850, 647 N.E.2d 1174 (1995).

Here, Williams fails to allege the terms of any contract or its duration. The complaint gives no explanation of the obligations created by the alleged contract. Therefore, the complaint fails to state a claim for breach of contract and accordingly, Count III will be dismissed. *See Doyle*, 103 F.3d at 195 (finding complaint, where similar facts were lacking, to be insufficient to state a breach of contract claim).

*4. Count IV: Breach of the Implied Covenant of Good Faith and Fair Dealing*

■ It is a general principle of Massachusetts law that "parties to contracts and commercial transactions must act in good faith toward one another." *Fortune v. National Cash Register Co.*, 373 Mass. 96, 102, 364 N.E.2d 1251 (1977). In Count IV, Williams seeks redress for Astra's conduct by alleging that Astra breached its duty of good faith and fair dealing, specifically claiming damages for loss of reputation, emotional distress, loss of income and fringe benefits, and other financial losses.

■ It is well settled that loss of reputation and emotional distress are not recoverable in a claim for breach of good faith. *See Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 893 (1st Cir.1988); *McCone v. New England Telephone & Telegraph Co.*, 393 Mass. 231, 471 N.E.2d 47 (1984). Furthermore, with respect to loss of income and fringe benefits, recovery is confined "to identifiable future benefit[s] ... reflective of past services," and prospective benefits not thus tied to past services are clearly excluded. *Sar-*

*gent v. Tenaska, Inc.*, 108 F.3d 5, 8 (1st Cir.1997) (quoting *Gram v. Liberty Mutual Ins. Co.*, 384 Mass. 659, 672, 429 N.E.2d 21 (1981)).

Here, Williams does not allege any earned salary or commission due to him on September 23, 1997, the date of his departure. The complaint also fails to describe with any specificity services that Williams rendered for which Astra tendered no payment. Therefore, Count IV will be dismissed for failure to allege compensable damages.

5. *Counts V and VI: Intentional and Negligent Infliction of Emotional Distress*

▆ In Counts V and VI, respectively, Williams asserts against Astra claims of intentional and negligent infliction of emotional distress. It is clear, however, that those claims are barred by M.G.L. c. 152 § 24, the exclusivity provision of the Workers' Compensation Act.[2] *Ruffino v. State Street Bank and Trust Co.*, 908 F.Supp. 1019, 1048–49 (D.Mass.1995); *Green v. Wyman–Gordon Company*, 422 Mass. 551, 557–560, 664 N.E.2d 808 (1996). Thus, Astra's motion to dismiss as to Counts V and VI will be ALLOWED.[3]

### ORDER

For the foregoing reasons, it is hereby ordered that 1) Defendant's motion to dismiss (Docket No. 4) is ALLOWED, and 2) Plaintiff's motion for leave to amend the

2. M.G.L. c. 152, § 24 states, in pertinent part: Waiver of right of action for injuries. An employee shall be held to have waived his right of action at common law or under the law of any other jurisdiction in respect to an injury that is compensable under this chapter, to recover damages for personal injuries, if he shall not have given his employer, at the time of his contract of hire, written notice that he claimed such right . . .

3. As Williams points out, it is well settled that an employee is not barred from bringing an action against a fellow employee who commits an intentional tort which "was in no way within the scope of employment furthering

complaint (Docket No. 6) is ALLOWED. Counts I, II, III, and IV are dismissed without prejudice and with leave to amend the complaint within twenty (20) days, if the absent allegations can be supplied in compliance with Fed.R.Civ.P. 11. Counts V and VI are dismissed with prejudice. Defendant's motion to strike (Docket No. 4) is DENIED as moot.

**So ordered.**

the interests of the employer." *Anzalone v. Massachusetts Bay Transportation Authority,* 403 Mass. 119, 124, 526 N.E.2d 246 (1988); *see Ruffino v. State Street Bank and Trust Co.,* 908 F.Supp. 1019 (D.Mass.1995). To the extent that Astra implies that the *Green* decision compromises the force and validity of that rule, this Court disagrees. *See Chan v. Immunetics, Inc.,* 9 Mass.L.Rptr. 719 (1999). Nevertheless, the stated rule allows intentional tort claims to be brought in certain instances only against *fellow employees* and therefore, has no bearing on the instant claim brought by Williams against Astra, his former employer.