# United States Court of Appeals
## For the First Circuit

No. 06-1721

NANCY BROOKS, TRUSTEE OF THE IRREVOCABLE TRUST
OF DONALD L. SILVERMAN AND AS EXECUTRIX FOR THE
ESTATE OF DONALD L. SILVERMAN, AND
JOAN SILVERMAN, TRUSTEE OF THE IRREVOCABLE TRUST
OF DONALD L. SILVERMAN AND AS EXECUTRIX FOR THE ESTATE
OF DONALD L. SILVERMAN,

Plaintiffs, Appellants,

v.

AIG SUNAMERICA LIFE ASSURANCE COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Circuit Judge,

Cyr, Senior Circuit Judge,

and Howard, Circuit Judge.

John Peter Zavez, with whom Noah Rosmarin and Adkins, Kelston
& Zavez, P.C. were on brief for appellants.
James R. Carroll, with whom Michael S. Hines and Skadden,
Arps, Slate, Meagher & Flom LLP were on brief for appellee.

March 23, 2007

**CYR**, **Senior Circuit Judge**.  Nancy Brooks and Joan Silverman, as trustees of an irrevocable trust created by Donald Silverman and as executors of his estate, appeal from a district court decision dismissing their putative class-action claims for breach of contract and unfair business practices against decedent's life insurer, AIG SunAmerica Life Insurance Company.  We affirm.

**I**

**BACKGROUND**

In May 1984, Mutual Benefit Life Insurance Company ("Mutual") issued a flexible premium adjustable life ("FPAL") insurance policy to Donald Silverman.  The FPAL policy provided, inter alia, a death benefit of $850,000 (provided Silverman survived until at least April 1999) and a maturity date of May 1, 2012.  Mutual agreed to provide Silverman with yearly reports showing the policy's current cash value, cash surrender value, total paid premiums, and total assessed charges.

Like most FPAL policies, the Mutual policy provided Silverman with a type of savings and investment feature, which depended on the potential investment growth of the policy's accumulated cash value (ACV).  Although Silverman could increase or decrease the amount and frequency of his planned premium payments (viz., the policy's "flexible premium" feature), he initially committed to pay a fixed $41,658.50 premium each year until the policy's maturity date.  These premium payments would be

added into the ACV of the policy.  Mutual would invest the ACV, and any interest or dividends earned (guaranteed not to be less than 4% annually) would be added back into the policy's ACV.

On the other hand, Mutual periodically would reduce the policy's ACV to account for cash withdrawals or loans from the ACV made to Silverman, a monthly charge (not to exceed $4 per month) for Mutual's administrative expenses, and the "cost of insurance" rate ("COI rate").  Unlike Silverman's fixed annual premiums, the COI rate, which reflected the current actual cost to Mutual of insuring the risks to Silverman's life, was expected to <u>increase</u> over the course of the policy term:

> The monthly cost of insurance rate is based on the sex, age, and rate class [<u>viz.</u>, Male/Non-smoker] of the insured.  Monthly cost of insurance rates will be determined by [Mutual] annually, by earnings, mortality, persistency, and expenses, including taxes.  Any change in rates will be in accordance with any procedures and standards on file with the Insurance Department of the jurisdiction in which this policy is delivered [<u>viz.</u>, Massachusetts].  Such cost of insurance rates will not be greater than those shown in the table of maximum monthly cost of insurance rates on page 15.

Because Silverman's annual premium payments were fixed, whereas COI rates would increase over time, the monthly COI rate deduction from the policy's ACV could deplete the policy's ACV rapidly if, for example, the insured failed to make timely premium payments, or if the investment return on the ACV was less than optimal.  For the years 1999, 2000, and 2001, however, the policy capped the monthly

COI rate that Mutual could deduct at $9.42, $10.42, and $11.47 per $1000 of insurance, respectively.

In March 1991, Silverman assigned ownership of his FPAL policy to the irrevocable trust ("the Trust") of which appellants currently serve as trustees. In 1994, the New Jersey Commissioner of Insurance took control of a financially-distressed Mutual, and developed a court-approved rehabilitation plan ("Rehabilitation Plan") transferring Mutual's assets and selected liabilities to MBL Life Insurance Corporation ("MBL Life"). Mutual policyholders, including Silverman, were given the option either to receive 55% of their policies' cash surrender value, or to have their policies restructured and transferred to MBL Life at their full value.[1] Silverman elected the latter option. From 1994 through 1999, MBL raised the COI rate from $3.36 per $1000 of insurance to $5.14 per $1000 of insurance.

In 1999, MBL Life obtained court approval pursuant to this Rehabilitation Plan to assign the Mutual policies to appellee AIG SunAmerica Life Assurance Company ("SunAmerica"). For the policy years 1999, 2000, and 2001, SunAmerica raised the monthly cost of insurance rate on Silverman's FPAL policy from $5.14 to $7.95 per $1000 of insurance. Silverman died on June 27, 2001, and SunAmerica paid the Trust a death benefit of $857,901.86.

---

[1]The restructuring did not affect any policy provision pertinent to this appeal.

-4-

By letter dated May 9, 2003, appellants notified SunAmerica, inter alia, that they believed its COI rate increases in 1999, 2000 and 2001 must have been overcharges, given that MBL Life had raised the COI rate at most by 11.5% (in 1997), whereas the SunAmerica COI rates for 1999 and 2000 were increased by 22.5% and 21.8% respectively as compared to the prior year. Appellants further faulted SunAmerica for failing to notify Silverman that he needed to increase the amount or frequency of his premium payments in order to offset the dramatically higher COI rates being deducted from his policy's ACV after 1999.

On May 28, 2003, SunAmerica sent appellants a letter explaining that "within certain limits, the owner [of an FPAL policy] is given flexibility to determine the amount of premium he or she wants to pay," that Silverman had made no premium payments in 1992 and 1993, that SunAmerica had sent annual statements to Silverman showing that his premium payments were insufficient to cover the COI rate deductions from the policy's ACV, and yet he never requested adjustments to his premium payments. SunAmerica also noted that the policy plainly provides that COI rates would increase (subject to guaranteed yearly caps) over the 28-year life of the policy, and that its COI rates for 1999, 2000, and 2001 were $6.52, $7.12, and $7.95, well below the policy caps $9.47, $10.42, and $11.47. On July 2, 2003, appellants responded, stating only that SunAmerica had failed to comply with their request that it

provide "the actual per thousand rate mortality charges" for the years before SunAmerica acquired the Silverman policy, or "as far back as you can provide." On August 5, 2003, SunAmerica sent appellants the requested information, for policy years 1994-1999 (viz., $3.36, $3.72, $4.17, $4.71, and $5.14).

In February 2005, appellants sent SunAmerica a demand letter pursuant to Mass. Gen. Laws Chapter 93A, alleging that SunAmerica had "willful[ly] and knowing[ly]" committed "unfair or deceptive acts or practices" by raising, "without any justification," the COI rates from 1999 to 2001, failing to warn Silverman that his policy's ACV was being depleted, and misrepresenting that its COI increases had been court-approved pursuant to the Rehabilitation Plan. SunAmerica responded by letter dated March 21, 2005, denying all of these allegations.

In May 2005, appellants, acting as trustees/executors of the Silverman trust and estate, filed this putative class-action diversity suit against SunAmerica in the United States District Court for the District of Massachusetts, alleging that SunAmerica's COI rate increases had breached the FPAL policy (Count 1), breached its implied covenant of good faith and fair dealing (Count 2), and violated the Massachusetts and California unfair business practices statutes (Counts 3 and 4). At the core of all four claims is this allegation:

> Upon information and belief, the [COI] Rate
> Increases were not made in accordance with any

-6-

> procedures and standards on file with the
> Insurance Department of the jurisdiction in
> which any of the Mutual Life Block of Policies
> were delivered.

(Emphasis added.)

SunAmerica moved to dismiss the complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). Finding that appellants' complaint failed to allege SunAmerica's "bad faith," the district dismissed the "breach of implied covenant" claim in Count 2, but deferred any ruling on the remaining counts subject to appellants' submission of a "supplemental pleading identifying with some specificity the provision or provisions of the contract alleged to have been breached and the manner in which they were breached."

Rather than submitting the invited supplemental pleading, however, appellants filed a supplemental brief in opposition to the SunAmerica motion to dismiss. Appellants cited the policy provision that COI rate changes would be "in accordance with any procedures and standards on file with the [Massachusetts Division of Insurance]," and a state regulation which they maintained had obligated SunAmerica to make such a filing as a precondition to selling FPAL policies in Massachusetts:

> Each filing for approval of a variable life
> insurance policy form shall include an
> actuarial memorandum, prepared and certified
> by a qualified actuary, in such form as may be
> described by the Commissioner, which contains
> a description of the company's
> methodology[ies] (sic) used to determine

-7-

> reserve liabilities for any guaranteed death
> benefits and other contingencies, including
> the mortality, expenses and other risks which
> the insurer will bear under the policy.

Mass. Regs. Code tit. 211, § 95.6(2) (2007) (emphasis added). Appellants asserted: "SunAmerica breached the insurance policy as modified [in the rehabilitation Plan] by making Rate Increases that were not in accordance with the COI Rate Increase Filing." SunAmerica in turn promptly renewed its motion to dismiss Counts 1, 3 and 4.

The district court rejected appellants' contention that Mass. Regs. Code tit. 211, § 95.6(2), which deals solely with the insurer's calculation of its reserve liabilities, was the regulatory filing contemplated by the FPAL policy provision that "[a]ny change in [COI] rates will be in accordance with any procedures and standards on file with the Insurance Department of the jurisdiction in which this policy is delivered." The district court generously ordered SunAmerica – not the appellants – to produce a copy of any filing it had made with the Massachusetts Division of Insurance anent COI rates changes pursuant to the pertinent policy provision.

SunAmerica produced a copy of an actuarial memorandum ("Actuarial Memorandum") identical to the one that Mutual and MBL Life would have filed with the Massachusetts Division of

Insurance,[2] but denied that it contained any "procedures and standards" relevant to its calculation of COI rates, and accordingly filed a motion for summary judgment on the remaining counts of appellants' complaint. Appellants filed a cross-motion for summary judgment.

In their opposition to the SunAmerica motion, appellants contended that the Actuarial Memorandum did contain procedures and standards for calculating COI rates. Appellants cited, <u>inter</u> <u>alia</u>:

Cost of Insurance

The guaranteed maximum cost of insurance rates applied in the calculation of Cash Value under this policy are stated in the contract. The company may use modified cost of insurance rates, applied in a uniform manner to all policies in a class, which produce lower costs of insurance. Use of such rates produces higher Cash Value than those calculated using the guaranteed rates.

Actuarial Memorandum Section II.B. Appellants pointed out Exhibit I of the Actuarial Memorandum, which sets forth the algebraic formula for calculating the "guaranteed maximum monthly cost of insurance rate for each attained age." They cited Section III of

---

[2]SunAmerica provided the affidavit of Gary Strunk, the insurance actuary who had prepared the Actuarial Memorandum for MBL Life. He attested that SunAmerica had been unable to find a copy of the Actuarial Memorandum after an exhaustive search of its records, and that the Massachusetts Division of Taxation notified him that it keeps such memoranda on file for only two years following the regulatory approval process. The actuary therefore provided a copy of the memorandum on file in the State of Texas, which was identical to the one that he would have filed in Massachusetts.

the Memorandum, which set forth the "Policy Value Formula," and indicated that COI is one of the factors in this formula, viz., "[t]he monthly cost of insurance for the death benefit, which depends on the net amount at risk and which is deducted on the [premium processing date]." Id. Section III.B. Appellants opposed the SunAmerica contention that the Actuarial Memorandum is irrelevant to COI rate changes:

> Defendants attempt to avoid this result by arguing that the Silverman Policy speaks of the change in monthly COI rates and the Actuarial Memorandum does not. This argument fails, however, because COI, COI rates, annual COI rates, monthly COI rates, and changes to any of the preceding are all algebraically related. . . . Consequently, any changes to any of the COI-related variables described above will affect all of the other variables.

Appellants claimed that ¶¶ 5-6 of the affidavit submitted by Gary Strunk, the actuary who provided SunAmerica with a copy of the Actuarial Memorandum, "confirm[ed] that the Actuarial Memorandum contains a calculation of COI."[3]

Appellants' opposition also asserted, for the first time, that the court-approved Purchase and Sale Agreement through which SunAmerica had acquired the Silverman policy contained a provision which prohibited it from changing the COI rate for the fifteen-

---

[3]Strunk attested that an actuarial memorandum would include "a section setting forth in descriptive format the components used to derive the policy's values including the minimum guaranteed interest rate to be credited to the policy owner and the cost of insurance, and a section setting forth the formulae to calculate the policy's value at any given time."

month period following its purchase:

> <u>Modified COI Scale</u>.  Mortality charges may be changed on the policy anniversary beginning 15 months after the Rehabilitation Period Termination Date [<u>viz.</u>, on May 1, 2001], to scales reflecting the greater of (a) actual mortality experience and (b) anticipated mortality experience based on the following formulas.

Purchase and Sales Agreement § 4.18.1.  Appellants accordingly contended that SunAmerica's annual increases in the COI rates before May 1, 2001, violated the Purchase and Sale Agreement.

Finally, appellants raised, once again for the first time, the contention that SunAmerica may have violated state regulations if it considered – as the policy expressly allowed – its "expectation as to investment earnings" in calculating the COI rate changes, since a state regulation does not specify investment earnings as a permissible deduction from the ACV of a FPAL policy. <u>See</u> Mass. Regs. Code tit. 211, § 95.05.[4]  Appellants noted that the

---

[4]The regulation provides, in pertinent part:

(1)  An insurer must clearly disclose in writing, at the time of solicitation or contemporaneously with delivery of the policy, all charges that may be made against the separate account.

(2)  An insurer may deduct only the following from the separate account:

(a)  taxes or reserves for taxes attributable to investment gains and income of the separate account as required by applicable state or federal law;
(b)  actual cost of reasonable brokerage fees and similar reasonable direct acquisition and

Actuarial Memorandum filed with the Massachusetts Division of Insurance does not disclose that SunAmerica intended to make any "investment earnings" deduction.

After oral arguments on the parties' cross-motions, the district court granted summary judgment for SunAmerica on the remaining counts of appellants' complaint.

**II**

**DISCUSSION**

**A.    Count 2: Breach of Implied Duty**

Appellants contend that the district court erred in granting SunAmerica's Rule 12(b)(6) motion to dismiss Count 2, which alleged that SunAmerica had breached the implied covenant of good faith and fair dealing "by fraudulently conceal[ing] that it

---

sales costs incurred in the purchase or sale of separate account assets;
(c)   actuarially determined mortality costs of insurance (tabular costs) and the release of separate account liabilities;
(d)   reasonable charges for administrative expenses and investment management expenses, including internal costs attributable to the investment management of assets of the separate account;
(e)   a reasonable charge, at a rate specified in the policy, for mortality and expense guarantees;
(f)   any amounts in excess of those required to be held in the separate account;
(g)   charges for incidental insurance benefits; and
(h)   any other type of charge that the Commissioner has determined to be fair and reasonable.

Mass. Regs. Code tit. 211, § 95.05 (2007).

had made the COI Rate increases in violation of the relevant insurance policy's terms by misrepresenting to the named plaintiffs and their agents several times between 2001 and the present that the Rehabilitation Plan authorized it to make the COI Rate increases . . . [whereas] the COI Rate increases were governed by the insurance policy language in ¶ 19." They argue that the district court erroneously held that SunAmerica could not have breached the implied covenant unless it breached an express contractual provision. See, e.g., Speakman v. Allmerica Fin. Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005) ("A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract.").

We lack appellate jurisdiction to consider appellants' challenge to the district court decision to dismiss Count 2 pursuant to Rule 12(b)(6). The district court dismissed Count 2 on October 5, 2005. Appellants' Notice of Appeal specifies that their appeal is taken from the district court "Order Granting Summary Judgment for Defendant entered 3 March 2006 (Exhibit A)." (Emphasis added.) Notices of appeal must "designate the judgment, order, or part thereof being appealed." Fed. R. App. P. 3(c)(1)(B). Even though notices of appeal are to be liberally construed, if the appellant "chooses to designate specific determinations in his notice of appeal - rather than simply appealing from the entire judgment - only the specified issues may

-13-

be raised on appeal." Constructora Andrade Gutierrez, S.A. v. Am. Int'l Ins. Co., 467 F.3d 38, 43 (1st Cir. 2006) (noting that "[t]he failure to include a particular issue in a notice of appeal can be fatal to this court's jurisdiction over that issue"). The notice of appeal plainly did not place SunAmerica on adequate notice that appellants were challenging the Rule 12(b)(6) dismissal six months prior to the grant of summary judgment on the remaining counts of the complaint.[5]

## B.   Count 1: Breach of Contract

Appellants next contend that the district court erred in granting summary judgment for SunAmerica on the breach-of-contract claim because trialworthy issues of material fact remained as to whether the SunAmerica COI rate changes for 1999, 2000, and 2001 violated the "procedures and standards" set forth in the Actuarial Memorandum.

We review the grant of summary judgment de novo, viewing all facts and reasonable inferences therefrom in favor of the non-moving party, to determine whether there are no genuinely disputed material facts and the moving party is entitled to judgment as matter of law. Commercial Union Ins. Co. v. Pesante, 459 F.3d 34,

---

[5]Even if we had appellate jurisdiction to consider the merits of the Rule 12(b)(6) dismissal of Count 2, our rationale for affirming the grant of summary judgment on the other counts would apply equally to Count 2. See infra Section II.B; Complaint ¶ 30 ("SunAmerica breached the implied covenant of good faith and fair dealing contained in the Class Member's (sic) insurance policy by making the COI Rate Increases.").

37 (1st Cir. 2006) (citing Fed. R. Civ. P. 56(c).  Should SunAmerica make a preliminary showing that no genuine issue of material fact exists, appellants – who must bear the burden of proof at trial on each element of their breach of contract claim – would have to produce "<u>specific</u> <u>facts</u>, in <u>suitable</u> <u>evidentiary</u> <u>form</u>, to establish the presence of a trialworthy issue." <u>Clifford</u> v. <u>Barnhart</u>, 449 F.3d 276, 280 (1st Cir. 2006) (emphasis added; citation omitted).

Massachusetts contract law applies in this diversity action.  <u>See</u> <u>Umstead</u> v. <u>Umstead</u>, 446 F.3d 17, 20 (1st Cir. 2006). In order to state a viable breach of contract claim under Massachusetts law, plaintiffs must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiffs sustained damages as a result of the breach. <u>See</u> <u>Michelson</u> v. <u>Digital Fin. Servs.</u>, 167 F.3d 715, 720 (1st Cir. 1999).  Plaintiffs also must do more than allege, in conclusory fashion, that the defendant breached the contract, by describing, with "substantial certainty," the specific contractual promise the defendant failed to keep.  <u>See</u> <u>Buck</u> v. <u>Am. Airlines, Inc.</u>, 476 F.3d 29, 38 (1st Cir. 2007) ("In a contract action, this irreducible ['substantial certainty'] minimum requires the pleader to 'explain what obligations were imposed on each of the parties by the alleged contract.'") (citations omitted); <u>Doyle</u> v. <u>Hasbro, Inc.</u>, 103 F.3d 186, 194-95 (1st Cir. 1996) (holding that "[c]onclusory statements

-15-

that 'Hasbro and its executives failed to meet their contractual requirement,' are insufficient to satisfy the pleading requirements"); <u>Williams</u> v. <u>Astra USA, Inc.</u>, 68 F. Supp. 2d 29, 37 (D. Mass. 1999).

The record plainly demonstrates that appellants failed to meet the "substantial certainty" requirement. Apparently, appellants <u>suspected</u> that SunAmerica miscalculated the COI rates for 1999, 2000, and 2001, based <u>solely</u> on the fact that, prior to SunAmerica's acquisition of the Silverman policy in 1999, COI rate increases had been 11.5%, at most, whereas the rate increases for 1999 and 2001 had been far greater, <u>viz.</u>, 22.5% and 21.8%. Arguably then, given this unexplained and dramatic differential, appellants may have had a legitimate reason for requesting SunAmerica to explain the precise calculation by which it had arrived at the COI rates of $6.52 and $7.12, <u>viz.</u>, to request SunAmerica to demonstrate what factors enumerated in the policy (<u>e.g.</u>, sex, age, rate class, earnings, mortality, persistency, expenses, and taxes) were encompassed within that calculation, and the value and weight SunAmerica assigned to each such factor. Presumably, the insurer has exclusive control over the internal documentation of these COI rate calculations, and it is unlikely that a policyholder, unschooled as an insurance actuary, could reasonably be expected to reconstruct (or divine) the precise algebraic formulae employed by the insurer in making the esoteric

-16-

calculations.

When they drafted their complaint, therefore, appellants had two options: (1) allege that the unexplained and dramatic increases in the COI rates beginning in 1999 were circumstantial evidence that SunAmerica had miscalculated the rates, perhaps by considering factors other than sex, age, rate class, earnings, mortality, persistency, expenses, and taxes; and/or (2) allege that Sun America had failed to comply with procedures or standards on file with state regulatory agencies, viz., the Massachusetts Division of Insurance. As noted, appellants did not allege the former, and chose to pursue only the latter allegation: "Upon information and belief, the [COI] Rate Increases were not made in accordance with any procedures and standards on file with the Insurance Department of the jurisdiction in which any of the Mutual Life Block of Policies were delivered." (Emphasis added.) This latter "information and belief" allegation presupposes, however, that – at the very least – appellants had reason to know what procedures and standards were on file at the Division of Insurance.[6]

---

[6]Contrary to appellants' assertion on appeal, their correspondence to SunAmerica dated May 9, 2003, and July 21, 2003, did not complain that SunAmerica's COI rate calculations had violated any procedures or standards on file with the Massachusetts Division of Insurance, nor did it ask SunAmerica whether it had complied with any such filings. Thus, their contention on appeal that SunAmerica's responsive correspondence of May 28, 2003, and March 25, 2005, deliberately "failed to disclose whether it followed the procedures on file with the MA DOI for enacting COI

In any event, unlike SunAmerica's calculations for the COI rates, which presumably were in SunAmerica's exclusive control, the Division of Insurance filings were accessible to appellants pursuant to Massachusetts "public records" law. See Mass. Gen. Laws. Ann. ch. 66, § 10 (2007) (providing that "any person" be permitted to inspect a "public record" on file with a state agency, and be furnished with a copy for a reasonable fee). Had appellants exercised due diligence, they would have had no problem satisfying the district court's repeated orders to specify what "procedures and standards" on file with the Division of Insurance SunAmerica had allegedly violated. If they did not exercise due diligence, their bringing a suit against SunAmerica was not based on "substantial certainty," Doyle, 103 F.3d at 194-95, but on sheer speculation, both as to whether any relevant procedures and standards were on file at the Division of Insurance, and more importantly, as to their contents and precisely how SunAmerica's COI rate calculations had violated them.

1.  **The Actuarial Memorandum**

Confronted with their ruinous pleading defect, appellants have scrambled – unsuccessfully – to recover some procedural footing.[7] When SunAmerica complied with the district court's order

Rate increases" is an exercise in revisionist history.

[7]Notably, appellants abandoned several of their earlier theories of breach. For example, they no longer argue that SunAmerica breached the contract by failing to notify Silverman of

-18-

to produce the Actuarial Memorandum, it proved not to be the smoking gun appellants might have anticipated, but an irrelevancy. Section II.B of the Memorandum, entitled "Cost of Insurance," deals only with how SunAmerica would calculate "[t]he <u>guaranteed</u> <u>maximum</u> cost of insurance rates applied in the calculation of Cash Value under this policy," and noted that these guaranteed maximum COI rates were stated in the policy.  (Emphasis added.)  Section II.B thus pertains to how SunAmerica arrived at the cap COI rates of $9.47, $10.42, and $11.47 for years 1999, 2000, and 2001, and had no necessary application to how it calculated the actual COI rates of $6.52, $7.12, and $7.95.  Exhibit I of the Actuarial Memorandum likewise includes the algebraic formula SunAmerica used to calculate the "<u>guaranteed</u> <u>maximum</u> monthly cost of insurance rate for each attained age," not the actual COI rate.  (Emphasis added.) Appellants do not allege that SunAmerica miscalculated the maximum COI rates of $9.47, $10.42, and $11.47.

Section III of the Actuarial Memorandum, entitled "Policy Value Formula," demonstrates the formula by which SunAmerica would calculate the policy's ACV.  The COI rate concededly is one

---

the depletion of his policy's ACV, presumably because Silverman received annual statements describing the current value of his policy's ACV, and the policy otherwise did not obligate SunAmerica specifically to notify policyholders if the ACV reached any minimum levels.  Likewise, appellants have not appealed from the district court's rejection of their theory that SunAmerica breached Mass. Regs. Code tit. 211, § 95.6(2), presumably because they recognize that the regulation obviously deals only with SunAmerica's "reserve liabilities," not its calculation of COI rates.

variable in that ACV calculation (along with, _e.g._, interest earned, the monthly expense charge and any cash withdrawals or loans to the policyholder) because the COI rate is one enumerated monthly deduction from the policy's ACV, but this cannot inform as to how the COI rate is calculated. In other words, although the formula $X = Y - Z$ may tell us how to calculate the value of X (_viz._, the ACV), it tells us nothing useful about how to calculate the value of Z (_viz._, the COI rate) in the first instance. Instead, Section III provides only, in the most general terms, that the COI calculation "_depends_ on the net amount at risk." (Emphasis added.)

In response, appellants simply advance the conclusory argument that "COI, COI rates, annual COI rates, monthly COI rates . . . are all _algebraically_ related. . . . [so that] any changes to any of the COI-related variable . . . will affect all of the other variables." Not surprisingly, however, they make no attempt to illustrate their theory. Appellants give one example: "[T]he monthly cost of insurance is just the annual cost of insurance divided by 12 (months)." This simplistic example proves nothing. In the formula $X = Y - Z$, the larger the value assigned to Z (_viz._, the COI rate), the smaller the amount of X (_viz._, ACV) will be (and vice versa), but that arithmetic truism still does not inform us _how_ to calculate the value for Z. Thus, the arithmetic interrelationship appellants posit is real, but irrelevant. Thus,

-20-

the district court properly found that the Actuarial Memorandum did not create a trialworthy issue of fact.

2. **The Purchase and Sale Agreement**

Appellants also contend for the first time, in opposition to SunAmerica's summary judgment motion, that the Purchase and Sale Agreement through which SunAmerica had acquired the Silverman policy contained a provision, entitled "Modified COI Scale," which provided that "[m]ortality charges may be changed on the policy anniversary beginning 15 months after the Rehabilitation Period Termination Date [viz., on May 1, 2001]," Purchase and Sales Agreement § 4.18.1, and that SunAmerica had violated this provision by increasing COI rates in 1999, 2000, and 2001. SunAmerica responds that the terms "COI Scale" and "COI Rate" are not equivalent, and that it did not increase the COI scale before May 1, 2001:

> [T]he plaintiff confuses the scale with the rate. The scale is, if you think of it as a staircase, we agree to keep the staircase in place of what it was costing for a thousand dollars of insurance, but in a variable life policy, or the whole [life] policy, you go up the stairs as you grow older and the cost of insurance increases.

Whatever vagueness one arguably might perceive in SunAmerica's explanation of the distinction between "mortality charges" and "COI rates,"[8] it is sufficient to note that it was incumbent on

---

[8]COI rates are determined, in part, by reference to standard statistical and actuarial charts (e.g., "Male/Non-smokers") which

appellants, as the parties with the ultimate burden to prove breach of contract at trial, to adduce "specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Clifford, 449 F.3d at 280. For example, appellants might have adduced an affidavit from an insurance actuary attesting to the essential equivalence between the terms "mortality charges" and "COI rates." Indeed, the district court expressly noted that, if appellants could prove that, "within the 15-month period, SunAmerica had changed the mortality tables, that would constitute a breach." On appeal, however, appellants make no such attempt, merely reiterating instead that SunAmerica breached § 4.18.1 by raising its COI rates from 1999-2001.

### 3. **Expectations of Investment Earnings**

Appellants raised, again for the first time in their reply opposition to SunAmerica's summary judgment motion, the contention that SunAmerica may have violated Mass. Regs. Code tit. 211, § 95.05, see supra note 4, when it considered its "expectation as to investment earnings" in calculating the COI rate changes, and

---

purport to predict the actual costs of insuring a person by age per $1000 of insurance, and each year as the person ages, the chart plots the corresponding rate increase to reflect the higher mortality expectations. See Aleksandr Mel'nikov, Mathematics of Financial Obligations, in American Mathematical Society § 9.2, at 167 (2007). These rates are not necessarily the final COI rate, however, because the insurer may adjust them to reflect the individual insured's circumstances, or as in the present case, consider other factors such as "earnings, mortality, persistency, and expenses, including taxes."

pursuant to Federal Rule of Procedure 56(f), requested further discovery on that factual issue.

SunAmerica argues that we should reject this argument because appellants did not raise the theory in their complaint, because SunAmerica's putative consideration of investment earnings would have resulted in its <u>lowering</u> of the COI rate (not an increase),[9] and because appellants failed to file their Rule 56(f) motion for further discovery until after they filed its initial opposition to SunAmerica's summary judgment motion.

We think the first ground suffices, and that further discovery (which would show, at most, whether SunAmerica did <u>in fact</u> consider anticipated earnings when it calculated COI rates) would not cure appellants' failure to allege this legal theory in their complaint.[10] As noted, the complaint was premised entirely on the allegation that "the [COI] Rate Increases were not made in accordance with any <u>procedures</u> <u>and</u> <u>standards</u> on file with the Insurance Department of the jurisdiction." Mass. Regs. Code tit.

---

[9]Arguably at least, SunAmerica might have considered "earnings," found them inadequate or disappointing, and increased the COI rate to compensate.

[10]By so holding, we do not suggest that appellants' legal argument has merit. In fact, Mass. Regs. Code tit. 211, § 95.05 allows the insurer to deduct from the accumulated cash account "any other type of charge that the Commissioner has determined to be fair and reasonable." The Division of Insurance approved the Silverman Policy despite its express provision that "[m]onthly cost of insurance rates will be determined by [Mutual] annually, <u>by earnings</u>."

-23-

211, § 95.05, a codified regulation, was not "on file" with the Massachusetts Division of Insurance. Prior to filing their complaint, appellants had reviewed the policy, which expressly stated that "[m]onthly cost of insurance rates will be determined by [Mutual] annually, by earnings." If they considered that this contract provision was per se violative of Mass. Regs. Code tit. 211, § 95.05, nothing prevented them from including such an allegation in their complaint. Any belated amendment of the complaint on the cusp of summary judgment – and we note that appellants have never attempted to amend their complaint – would be unfair to SunAmerica. See Adorno v. Crowley Towing & Transp. Co., 443 F.3d 122, 126 & n.3 (1st Cir. 2006) (noting that party urging amendment of its complaint "at the 'eleventh hour to fend off summary judgment'" must demonstrate "'that the proposed amendments [are] supported by substantial and convincing evidence'") (quoting RTC v. Gold, 30 F.3d 251, 253 (1st Cir. 1994)). In short, SunAmerica should not be made to shoot at a continuously moving target.

## C. **Count 3: Violation of Mass. Gen. Laws Chapter 93A**[11]

Finally, appellants contend that SunAmerica engaged in an unfair business practice by overcharging on the COI rates for 1999,

___

[11]Appellants also argue that the district court erred in granting summary judgment on Count 4 asserting an unfair business practices claim under California law, but our rationale for affirming the dismissal of their Chapter 93A applies equally to Count 4.

2000, and 2001, and subsequently engaging in a willful campaign to conceal their misconduct.  See Mass. Gen. Laws Chapter 93A, § 2 ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.").

To the extent that their Chapter 93A claim is premised merely on their allegations that SunAmerica breached the insurance contract – either by violating its express terms or by failing to follow the incorporated "standards or procedures on file" with the Division of Insurance – it falls well short of the Chapter 93A liability threshold.  See Commercial Union Ins. Co. v. Seven Provinces Ins. Co., Ltd., 217 F.3d 33, 40 (1st Cir. 2000) ("A mere breach of contract does not constitute an unfair or deceptive trade practice under 93A, unless it rises to the level of 'commercial extortion' or a similar degree of culpable conduct.") (citing Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 821 (Mass. 1991)); Chambers Steel Engraving Corp. v. Tambrands, Inc., 895 F.2d 858, 861 (1st Cir. 1990) ("The mere breach of contract, without more, even if one existed, would not violate ch. 93A."). Moreover, appellants failed even to make a viable Rule 56 proffer that SunAmerica violated any provision of the policy, any procedures or standards on file with the Massachusetts Division of Taxation, or any pertinent statute or regulation.  See supra Section II.B.  In view of these deficiencies, the district court

properly dismissed appellants' Chapter 93A "unfair business practices" claim.

## III

## <u>CONCLUSION</u>

This might have been a different case if appellants had alleged in their complaint that the substantial percentage increases in the COI rates beginning in 1999 (increasing from 11.5% to 22.5%), when SunAmerica acquired the Silverman Policy, were circumstantial evidence that SunAmerica had inflated the rates for improper purposes, perhaps by considering factors other than sex, age, rate class, earnings, mortality, persistency, expenses, and taxes. As the torturous procedural travel of this case demonstrates, <u>see</u> <u>supra</u> Section I, appellant chose a different course, and alleged only that SunAmerica violated the policy by failing to comply with unspecified "procedures and standards" on file with the Massachusetts Division of Insurance. Those regulatory filings were not in SunAmerica's exclusive control, and before filing suit, it was incumbent on appellants to determine whether and how the contents of these filings were relevant to the calculation of COI rates. Without such basic information, appellants' complaint was a veritable shot in the dark.

**<u>Affirmed</u>**.