# United States Court of Appeals
## For the First Circuit

No. 12-1548

ANGEL MARTINEZ ALICEA, p/k/a Ruf El Fantaztiko;
FREDDY MONTALVO; RAUL RIVERA ROLDAN, p/k/a Thilo;
REYNALDO COLON VEGA, p/k/a Limits,
Plaintiffs, Appellants,

JOSE DELGADO, p/k/a Buk Dollar;
GERRY CAPO HERNANDEZ, p/k/a Lionize,
Plaintiffs,

v.

MACHETE MUSIC, a division of UMG Recordings, Inc.;
UMG RECORDINGS, INC.,
Defendants, Appellees,

LT'S BENJAMIN RECORDS, INC.; FRANCISCO SALDANA, p/k/a Luny;
VICTOR CABRERA, p/k/a Tunes; RAMON AYALA, p/k/a Daddy Yankee;
LOS CANGRIS, INC.; EL CARTEL RECORDS, INC.,
Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before
Howard, Selya, and Stahl,
Circuit Judges.

David A. Mech, with whom Law Offices of David A. Mech was on brief, for appellants.
Linda M. Burrow, with whom Alison Mackenzie, Caldwell Leslie & Proctor, PC, Daniel J. Cloherty, and Collora LLP were on brief, for appellees.

March 7, 2014

**HOWARD, <u>Circuit Judge</u>**.  Over a century ago, Mark Twain lamented that "[o]nly one thing is impossible for God: to find any sense in any copyright law on the planet."  Mark Twain, <u>The Complete Works of Mark Twain: Mark Twain's Notebook</u> 381 (Albert Bigelow Paine ed., 1935).  We fear that Twain's deity would fare little better with the tangled skein of copyright and contractual claims presented by the plaintiffs in this case.  Confining our inquiry to the arguments seasonably raised before the district court and to the factual background at the time of summary judgment, we conclude that the district court did not err in granting the defendants' motion for summary judgment and denying the plaintiffs' subsequent motion for reconsideration.

## I.

The plaintiffs Angel Martinez Alicea ("Martinez"), Freddy Montalvo, Raul Rivera Roldan ("Rivera"), and Reynaldo Colon Vega ("Colon") are Massachusetts-based producers of "reggaeton" music, a musical genre originating in Puerto Rico and boasting such diverse origins as reggae, hip hop, salsa, and meringue.[1]  This lawsuit concerns seven songs ultimately released on an album distributed by the defendants, allegedly infringing upon the

---

[1]Two additional plaintiffs, Jose Delgado and Gerry Capo Hernandez, were previously dismissed from the case.

plaintiffs' copyrights and breaching contracts to which the plaintiffs claim to be parties and/or third-party beneficiaries.[2]

The events underlying this case date back to 2006, when Francisco Saldana, a Puerto Rico-based reggaeton producer who with Victor Cabrera founded a record label named "Mas Flow," began looking for a new vocalist. After posting an online advertisement, Saldana soon received numerous emails and recordings from Gerry Capo Hernandez ("Capo"), a reggaeton performer then residing in Springfield, Massachusetts. Saldana invited Capo to his recording studio in Puerto Rico, where Capo soon became part of a new reggaeton group known as "Erre XI." In May 2007, Saldana reached out to Angel Martinez Alicea, Freddy Montalvo, and Etienne Gagnon, three reggaeton producers from Springfield who had worked with Capo in the past, and invited them to his studio to produce two songs for Erre XI. Upon hearing the two songs, Saldana pronounced Martinez and Montalvo his "new stars." Martinez and Montalvo subsequently signed producer agreements with Mas Flow entitling them to royalty payments for the songs they produced.

Over the next several months, Martinez, Capo, Montalvo, and Gagnon worked in Saldana's studio on new songs for the Erre XI album, performing vocals, composing beats and instrumentals, and

_____

[2]The plaintiffs' complaint also charged the defendants with copyright infringement and breach of contract as to an eighth song titled "Salgo Pa La Calle," which is no longer at issue on this appeal.

-3-

providing sound engineering services.  They were joined by Reynaldo Colon Vega, a vocalist recruited by Martinez and Saldana in July 2007, and by Raul Rivera Roldan, a producer who had worked with Saldana since 2004 and who had previously produced two songs, "Mirala Bien" and "Paleta," released on a CD titled "Pa'l Mundo" in 2005.  Colon signed an exclusive recording agreement with Mas Flow in September 2007, while Rivera had signed a producer agreement with Mas Flow in June 2006.

Since April 2004, Mas Flow had licensed to Machete Music ("Machete"), a division of UMG Recordings, Inc. ("UMG"), the "exclusive right to sell and distribute" Mas Flow's recordings.  In August 2007, Mas Flow and its successor in interest, LT's Benjamin Records, Inc. ("LT"), entered into a new Profit Share Agreement with Machete, creating a new record label and providing for the division of profits from the sale of albums delivered by Mas Flow and distributed by Machete.

Seven songs on which the plaintiffs worked eventually appeared on the Erre XI album distributed by Machete in 2008: "Al Desnudo," "Carita Bonita," "Dimelo," "Ella Me Amo," "La Carta," "MSN," and "Te Hice Volar."  Although the melodies to these songs remained largely identical to the versions produced by the plaintiffs, many of the plaintiffs' musical and vocal contributions were replaced with the work of other artists.

The plaintiffs filed suit on January 5, 2010, asserting counts of copyright infringement, breach of contract, fraudulent inducement of services, unjust enrichment, and intentional and negligent infliction of emotional distress. Their complaint named as defendants Saldana, Cabrera, White Kraft Music Publishing, and LT (the "LT defendants"); Ramon Ayala, professionally known as "Daddy Yankee," El Cartel Records, Inc., and Los Cangris, Inc. (the "Daddy Yankee defendants"); and UMG and Machete (the "UMG defendants").[3] Two months later, Capo and Colon registered with the U.S. Copyright Office the copyrights in the sound recordings for four of the songs, "Carita Bonita," "Al Desnudo," "Te Hice Volar," and "Dimelo," each of which had numerous composers and vocalists. In July 2010, the plaintiffs filed with the district court a printout from the Copyright Office indicating that they had filed for sound recording registration in the remaining three songs.

On January 11, 2011, the district court adopted the magistrate judge's report and recommendation, granting the motion to dismiss as to the Daddy Yankee defendants for failure to state a claim and lack of personal jurisdiction and also dismissing the emotional distress claims against the UMG defendants. However, the court denied the UMG defendants' Rule 12(b)(6) motion to dismiss

---

[3]White Kraft Music Publishing and UMG were not named as defendants in the original complaint, and were added in the plaintiffs' second amended complaint.

the plaintiffs' copyright and contract claims.  On October 6, 2011, the court adopted a second report and recommendation from the magistrate judge and dismissed the claims against the LT defendants for lack of personal jurisdiction.[4]  Neither the Daddy Yankee defendants nor the LT defendants remain parties to this appeal.

The remaining defendants, Machete and UMG, moved for summary judgment.  With respect to the copyright claims, the defendants argued inter alia that as late as September 2011 the plaintiffs still had not shown that they had registered copyrights in the underlying compositions that they claimed were infringed, as is required under 17 U.S.C. § 411(a).  As for the contract claims, the defendants argued that the plaintiffs had failed to establish either that they had a direct contractual relationship with the UMG defendants or that they were third-party beneficiaries of the distribution and profit share agreements between Machete and Mas Flow.

In opposition to the defendants' motion, the plaintiffs stated that they had filed copies of the allegedly infringing Erre XI recordings with the Copyright Office, and introduced an email from the Copyright Office explaining that the office was still in the process of determining whether the plaintiffs had submitted

---

[4]The magistrate judge also recommended the dismissal of Gerry Capo Hernandez as a plaintiff, as Capo had stated in an affidavit that he did not wish to continue as a plaintiff.

permissible deposits of the recordings.[5]  At a January 2012 hearing on the defendants' motion, plaintiffs' counsel informed the district court that the Copyright Office still had yet to determine whether the deposited recordings, although not the original recordings on which the plaintiffs had worked, were nevertheless acceptable for registration purposes.

On February 23, 2012, the court granted the UMG defendants' motion for summary judgment.  The court concluded that even "[a]fter more than two years of litigation," the plaintiffs had not satisfied the registration precondition of § 411(a), having neither obtained registration certificates for the compositions nor even shown that they had submitted all of the necessary application materials for registration.  With respect to the breach of contract claims, the court found no evidence either of a direct agreement between the parties or of third-party beneficiary status.  The court also denied the plaintiffs' motion for additional discovery under Fed. R. Civ. P. 56(d) and the plaintiffs' motion to transfer the case to the District of Puerto Rico and consolidate it with parallel litigation pending there.

---

[5]The plaintiffs initially appeared to concede their copyright infringement claims, stating in their opposition to the defendants' summary judgment motion that "as far as Erre XI is concerned," they were "no longer alleging copyright infringement."  But they reasserted copyright infringement in a subsequent sur-reply, and the district court ultimately ruled on the copyright claims in its summary judgment order.  We therefore decline the defendants' invitation to treat these claims as waived outright.

Four weeks later, the plaintiffs filed a motion to reconsider under Fed. R. Civ. P. 59(e), claiming "new evidence" unavailable at the time of the district court's order: namely, newly obtained Copyright Office registration certificates for two of the Erre XI songs ("Carita Bonita" and "MSN") and rejection letters for three other songs from the album ("Ella Me Amo," "Dimelo," and "Al Desnudo").[6] The district court denied this motion on April 18, 2012. This appeal followed.

## II.

On appeal, the plaintiffs assign error to the district court's grant of summary judgment and its subsequent denial of their motion for reconsideration, along with its denial of their motions for transfer and additional discovery. We begin with the summary judgment order, which we review de novo. In so doing, we "draw[] all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation." Smith v. Jenkins, 732 F.3d 51, 76 (1st Cir. 2013) (internal quotation marks omitted). In reviewing the district court's denial of the plaintiffs' subsequent motion to reconsider the summary judgment order, we "will not overturn the court's determination unless a miscarriage of justice is in prospect or the record otherwise reveals a manifest abuse of

---

[6]As for the remaining two songs, "La Carta" and "Te Hice Volar," the plaintiffs stated in their motion that the registration applications were "still pending."

-8-

discretion." Meléndez v. Autogermana, Inc., 622 F.3d 46, 55 (1st Cir. 2010) (internal quotation marks omitted). We are not bound by the district court's rationale, and we may "affirm a correct result reached by the court below on any independently sufficient ground made manifest by the record." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 173 (1st Cir. 1998) (internal quotation marks omitted). We turn first to the plaintiffs' copyright infringement claims.

## A.    Copyright Claims

### 1.    Summary Judgment

The district court's grant of summary judgment to the defendants rested on its conclusion that the plaintiffs had failed to register their copyrights in the allegedly infringed compositions, a prerequisite to an infringement action under 17 U.S.C. § 411(a). Section 411(a) provides in pertinent part that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." In order to register a copyright in a published work, the owner of a copyright must submit to the Copyright Office an application, fee, and two complete copies of the work to be copyrighted. See 17 U.S.C. § 408(a), (b)(2). Although this registration requirement does not circumscribe a federal court's subject-matter jurisdiction, the Supreme Court has described it as "a precondition to filing a claim." Reed Elsevier, Inc. v.

<u>Muchnick</u>, 559 U.S. 154, 157 (2010); <u>see</u> <u>also</u> <u>Latin Am. Music Co.</u> <u>Inc.</u> v. <u>Media Power Grp., Inc.</u>, 705 F.3d 34, 42 (1st Cir. 2013).

As the district court recognized, and as we described in <u>Latin American Music Co.</u>, "[c]ircuits are split on whether the registration requirement is satisfied at the time the copyright holder's application is received by the Copyright Office (the 'application approach'), or at the time that the Office acts on the application and issues a certificate of registration (the 'registration approach')."  705 F.3d at 43 n.11 (internal quotation marks omitted); <u>see</u> <u>also</u> 2 Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u> § 7.16[B][3] (discussing the two approaches and favoring the application approach).[7]  <u>Latin American Music Co.</u> did not give us occasion to choose between the two paradigms, as the plaintiff could not even "show that it had submitted all the necessary application materials for registration."  705 F.3d at 43 n.11.  Our conclusion was consistent with Nimmer's explanation that

> [a]bsent issuance of a certificate and in the
> absence of the copyright owner even having
> sent the requisite application (together with
> deposit and fee) to the Copyright Office,

---

[7]For cases applying the registration approach, <u>see</u>, <u>e.g.</u>, <u>La Resolana Architects, PA</u> v. <u>Clay Realtors Angel Fire</u>, 416 F.3d 1195, 1202-07 (10th Cir. 2005), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Reed Elsevier</u>, 559 U.S. 154; <u>M.G.B. Homes, Inc.</u> v. <u>Ameron Homes, Inc.</u>, 903 F.2d 1486, 1488-89 (11th Cir. 1990), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Reed Elsevier</u>, 559 U.S. 154.  For the application approach, <u>see</u>, <u>e.g.</u>, <u>Cosmetic Ideas, Inc.</u> v. <u>IAC/Interactivecorp.</u>, 606 F.3d 612, 615-21 (9th Cir. 2010); <u>Chi. Bd. of Educ.</u> v. <u>Substance, Inc.</u>, 354 F.3d 624, 631 (7th Cir. 2003); <u>Apple Barrel Prods., Inc.</u> v. <u>Beard</u>, 730 F.2d 384, 386-87 (5th Cir. 1984).

> there is, under all viewpoints, a defect under the statute . . . . As an absolute limit, if the Copyright Office has failed to receive the necessary elements to issue a registration certificate prior to the time that the court is called upon to issue final judgment, the action must be dismissed.

Nimmer, supra, § 7.16[B][3][c] (footnotes omitted); see also Kernel Records Oy v. Mosley, 694 F.3d 1294, 1302 (11th Cir. 2012).

Once again, we need not decide whether the application approach or the registration approach should govern, as we conclude that the defendants were entitled to summary judgment under either approach. More specifically, we agree with the district court's conclusion that summary judgment was proper because there was a lack of evidence as to "whether the copies [that the plaintiffs] submitted to the Copyright Office [i.e., copies of the allegedly infringing sound recordings from the defendants' album rather than the original recordings on which the plaintiffs had worked] me[t] all of the requirements for deposit copies" and "the Copyright Office ha[d] not yet taken a position on whether it ha[d] received all of the required materials for registration."

We find no competent evidence to the contrary in the summary judgment record. Instead, the plaintiffs submitted an email from the Copyright Office dated September 22, 2011, which stated that the office was still "waiting to resolve" the question of "whether a copy of an[] unauthorized track, that contains the original composition embedded in the track, can be used as deposit

material."  The email further explained that "in general, an unauthorized copy cannot be used as deposit material."  Over four months later, at a hearing before the district court on the defendants' summary judgment motion, no progress appeared to have been made: plaintiffs' counsel informed the court that the Copyright Office was still "trying to determine [] whether or not the deposit copies, the actual songs we deposited, are okay to deposit," and admitted that the office had "not yet decided one way or another whether they have a deposit copy" and, if not, whether the plaintiffs would be "relieved of the obligation to submit a deposit copy in the circumstances of this case."

Against this backdrop, we find no error in the district court's summary judgment order.  More than two years after filing suit, the plaintiffs still had not established that their applications to the Copyright Office were complete; by their own admission, the adequacy of the deposited recordings remained an open question.  Cf. Geoscan, Inc. of Tex. v. Geotrace Techs., Inc., 226 F.3d 387, 393 (5th Cir. 2000) (upholding summary judgment where "correspondence between the Copyright Office and [plaintiff] indicate[d] that registration of the copyrights was not complete . . . because [plaintiff] had not submitted for deposit the original source codes for its software . . . .").

Although the plaintiffs assign blame to both the defendants and the district court for this state of affairs, we are

unpersuaded by their arguments. The plaintiffs' appellate brief is filled with blurred and oblique insinuations of wrongdoing by the defendants, the import of which is not clear. Faced with these rudimentary assertions, "we see no reason to abandon the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990); see also Tower v. Leslie-Brown, 326 F.3d 290, 299 (1st Cir. 2003).

The plaintiffs elsewhere appear to contend that the district court ignored the existence of sound recording registrations obtained by Capo and Colon for four of the songs. This argument, too, is a nonstarter. As we have explained in the past, "sound recordings and their underlying musical compositions are separate works with their own distinct copyrights." Johnson v. Gordon, 409 F.3d 12, 26 n.8 (1st Cir. 2005) (internal quotation marks and brackets omitted). Given that distinction, the Copyright Office only permits the joint registration of a musical composition and a sound recording in a single application "if ownership of the copyrights in both is exactly the same." U.S. Copyright Office, Circular 56A: Copyright Registration of Musical Compositions and Sound Recordings (2012). As the parties do not dispute that the authorship of the four registered sound recordings is not coextensive with the authorship of the underlying compositions, the

registration of the sound recordings has no bearing on the plaintiffs' claims for compositional copyright infringement.

To the extent that the plaintiffs alternatively suggest on appeal that they are also claiming infringement in the sound recordings, that claim lacks any foundation in the underlying complaint, which refers only to the plaintiffs' copyrights in the "Original Compositions."  It is therefore no surprise that the district court did not address this purported claim in its summary judgment order.  The plaintiffs' failure to adequately raise this argument below dooms it on appeal.  See Iverson v. City of Boston, 452 F.3d 94, 102 (1st Cir. 2006) ("[T]heories not squarely and timely raised in the trial court cannot be pursued for the first time on appeal."); see also McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991).

We reach the same conclusion with respect to the plaintiffs' supposed request for a declaration of joint authorship. The statement of claims in the plaintiffs' complaint makes no mention of a joint authorship claim; the only references to such a claim are contained in the "Nature of the Action" and "Requests for Relief" sections, which request that the court declare each of the plaintiffs "an author . . . and co-owner of copyright in the Original Compositions."  But "the prayer for relief is no part of the cause of action," Coll v. First Am. Title Ins. Co., 642 F.3d 876, 901 (10th Cir. 2011) (internal quotation marks omitted), and

the plaintiffs cannot now flesh out this inadequately pleaded claim on appeal, see Iverson, 452 F.3d at 102; McCoy, 950 F.2d at 22.

## 2.   Motion for Reconsideration

We now turn to the plaintiffs' motion for reconsideration.  At some point after the district court issued its summary judgment order, the plaintiffs finally obtained copyright registrations in two of the songs, "MSN" and "Carita Bonita." Their applications for registration in three other songs ("Ella Me Amo," "Dimelo," and "Al Desnudo") were denied on the basis that the non-original deposit copies did not contain the plaintiffs' contributions.  At least with respect to the two registered songs, the plaintiffs suggest that newly discovered evidence -- to wit, the certificates of registration -- required the court to grant their motion for reconsideration.[8]

The plaintiffs moved for reconsideration within the 28-day window provided by Fed. R. Civ. P. 59(e), and we therefore treat their motion as a motion to alter or amend the district court's judgment.  See United States v. $23,000 in U.S. Currency, 356 F.3d 157, 165 n.9 (1st Cir. 2004).  Rule 59(e) contemplates reconsideration based on, inter alia, evidence discovered after the

---

[8]To the extent that the plaintiffs imply that the Copyright Office rejection letters also represent new evidence compelling reconsideration, we find their argument unfounded: the Copyright Office's decision to reject three of the applications for inadequate deposits vindicates, rather than calls into question, the district court's conclusion at summary judgment.

entry of judgment, and we have cautioned that it "does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to judgment." Emmanuel v. Int'l Bhd. of Teamsters, Local Union No. 25, 426 F.3d 416, 422 (1st Cir. 2005) (internal quotation marks omitted). A district court thus "does not abuse its discretion by denying a motion for reconsideration grounded on the discovery of evidence that, in the exercise of due diligence, could have been presented earlier." Id.; see also 11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2808 ("Newly discovered evidence must be of facts existing at the time of trial. The moving party must have been excusably ignorant of the facts despite using due diligence to learn about them." (footnotes omitted)).

In denying the plaintiffs' motion for reconsideration, the district court stated that it did so "for the reasons set forth in Defendants' Opposition and supporting memorandum." In their opposition to the plaintiffs' motion, the defendants had argued that reconsideration of the copyright claims "would be futile because plaintiffs granted licenses for use of their compositions," immunizing the defendants from liability for infringement. We do not reach the question of whether the defendants held licenses in the plaintiffs' compositions, however, as the plaintiffs' motion for reconsideration fails for an even more fundamental reason. See Hodgens, 144 F.3d at 173 (we may "affirm a correct result reached

-16-

by the court below on any independently sufficient ground made manifest by the record" (internal quotation marks omitted)). Specifically, the subsequently obtained certificates of registration for "Carita Bonita" and "MSN" do not represent "newly discovered evidence" warranting reconsideration under Rule 59(e).

This conclusion is particularly straightforward under the "registration approach" discussed above. At the time that the district court entered its summary judgment order, the plaintiffs had not yet obtained registration in any of the Erre XI songs. Given that state of affairs, the district court was entirely justified in awarding summary judgment. The plaintiffs' subsequent success in registering "Carita Bonita" and "MSN" is simply beside the point, as these registrations are new facts altogether, not new evidence of facts existing <u>at the time of summary judgment</u>. <u>See</u> 11 Wright & Miller, <u>supra</u>, at § 2808; <u>cf.</u> <u>Betterbox Commc'ns Ltd.</u> v. <u>BB Techs., Inc.</u>, 300 F.3d 325, 330-32 (3d Cir. 2002) (Alito, J.) (rejecting counterclaiming defendant's argument that subsequent cancellation of plaintiff's trademark registration constituted "newly discovered evidence" justifying relief under Fed. R. Civ. P. 60(b)(2), "because the fact of cancellation was not in existence at the time of trial").

The plaintiffs fare no better under the "application approach." At best, the subsequent registrations might be taken as proof that the plaintiffs had submitted complete applications for

-17-

these two songs by the time of summary judgment.[9]  Even assuming

that to be the case, however, the plaintiffs have not shown that

they were excusably ignorant of the fact that their applications

were complete at the time of summary judgment, or that due

diligence (e.g., an inquiry to the Copyright Office) would not have

uncovered this fact.  See Emmanuel, 426 F.3d at 422; 11 Wright &

Miller, supra, at § 2808.  To the contrary, since the plaintiffs

themselves were responsible for submitting a complete application

to the Copyright Office, it is only fair to infer that they were in

a position to know whether their applications were complete and to

provide the district court with evidence of this fact.

The plaintiffs took neither of these steps; instead, as

shown above, they represented to the district court that the

Copyright Office had not yet determined whether their applications

were complete.  Moreover, the plaintiffs did not file a motion for

continuance in order to obtain evidence that the applications were

in fact complete.  We therefore find it surpassingly hard to

---

[9]We note, however, that nothing in the record appears to compel that conclusion.  The plaintiffs' motion for reconsideration and attached certificates of registration offer no explanation for why "Carita Bonita" and "MSN" were registered but the other songs were not.  It is certainly possible that these two applications were not complete until after summary judgment, in which case the registrations would not represent evidence of facts existing at the time of summary judgment.  Cf. Betterbox, 300 F.3d at 331-32 (rejecting the argument that "post-trial cancellation show[ed] that, at the time of trial, the [Patent and Trademark Office] had already decided to cancel" the registration, because the "notice of cancellation [did] not reveal that a decision to cancel had been made at the time of trial").

-18-

believe that the plaintiffs could not have exercised greater diligence either in filing their applications with the Copyright Office or in their representations before the district court concerning the registration issue.  Cf. Betterbox, 300 F.3d at 332 (even assuming arguendo that subsequent cancellation was evidence that an internal decision had been made to cancel the plaintiff's trademark registration by the time of trial, the counterclaimant "ha[d] not shown that it exercised due diligence in attempting to obtain evidence of such a decision," nor had it "ask[ed] for a trial continuance for the purpose of obtaining evidence that cancellation was imminent").  We therefore find no abuse of discretion on the part of the district court.

### B.  Contract Claims

#### 1.  Rivera Claim

The plaintiff Raul Rivera Roldan brought an individual claim for breach of contract based on an alleged direct contractual relationship with the UMG defendants as to two songs, "Mirala Bien" and "Paleta," from the 2005 "Pa'l Mundo" CD.  In addition to expressing skepticism as to whether this claim was adequately set forth in the complaint, the district court also found "no evidence" of such a contract in the record, and accordingly granted summary judgment to the defendants.

The parties do not dispute the applicability of Massachusetts contract law to this action.  In order to establish

a claim for breach of contract under Massachusetts law, a plaintiff must, inter alia, "prove that a valid, binding contract existed." Brooks v. AIG SunAmerica Life Assurance Co., 480 F.3d 579, 586 (1st Cir. 2007). Moreover, a plaintiff cannot merely "allege, in conclusory fashion, that the defendant breached the contract," and must instead "describ[e], with substantial certainty, the specific contractual promise the defendant failed to keep." Id. (internal quotation marks omitted).

Applying that legal standard, we find no error on the part of the district court. We agree with the district court that Count IX of the plaintiffs' complaint, alleging breach of contract as to Rivera, fails to identify -- let alone "describ[e], with substantial certainty," id. -- a specific contract between Rivera and the UMG defendants.[10] Nor does any of Rivera's cited evidence establish such a contract. Although Rivera did sign a 2006 recording agreement with Mas Flow providing for the payment of royalties, that document makes no mention of the UMG defendants and instead leaves Mas Flow responsible for compensation. Rivera's subjective understanding that "Universal Music [i.e., UMG] was responsible for paying the mechanical royalties" is not alone

---

[10]Count IX instead alleges that Rivera contracted with the LT defendants and that this contract was later "transferred to 'The Label'" -- i.e., the "Label" created by the 2007 Profit Share Agreement between LT and Machete. As we explain in section B.3 infra, however, the plaintiffs have failed to adequately raise before us the argument that their contracts were assigned to the UMG defendants, and we therefore consider it waived.

enough to prove the existence of a direct contract with the UMG defendants. Finally, a UMG "song information sheet" showing Rivera's royalty percentage is not itself a contract between Rivera and UMG, and Rivera has pointed to no specific agreement to which this document is tied.

The remaining evidence on which Rivera relies -- the 2007 Profit Share Agreement, and an expert witness report interpreting this agreement -- reflects an agreement between LT and Machete, and in no way establishes a direct contractual relationship between Rivera and the UMG defendants. Whether Rivera and the other plaintiffs are third-party beneficiaries of this contract is a separate question to which we presently turn.

## 2.   **Profit Share Agreement**

The plaintiffs next contend that the district court erred in awarding summary judgment on their third-party beneficiary claims regarding the defendants' alleged breach of the August 2007 Profit Share Agreement between Machete and LT. Noting that only one of the plaintiffs (Rivera) was even named in the Agreement, the district court found that the plaintiffs had "failed to plead sufficient facts to support" a third-party beneficiary claim and that they were at best merely incidental beneficiaries of the Profit Share Agreement.

Under Massachusetts law, a plaintiff seeking to enforce a contract as a third-party beneficiary must demonstrate "from the

language and circumstances of the contract that the parties to the contract clearly and definitely intended the beneficiaries to benefit from the promised performance."  Miller v. Mooney, 725 N.E.2d 545, 550 (Mass. 2000) (internal quotation marks and brackets omitted); see also Anderson v. Fox Hill Vill. Homeowners Corp., 676 N.E.2d 821, 822-23 (Mass. 1997).  Merely incidental beneficiaries lack standing to enforce a contract.  See Harvard Law Sch. Coal. for Civil Rights v. President & Fellows of Harvard Coll., 595 N.E.2d 316, 319 (Mass. 1992); Choate, Hall & Stewart v. SCA Servs., Inc., 392 N.E.2d 1045, 1051 (Mass. 1979); Restatement (Second) of Contracts §§ 302, 315 (1981).  On appeal, the plaintiffs point to four paragraphs of the Profit Share Agreement evincing, in their view, a sufficiently clear and definite intent for them to benefit.[11]  We address each in turn.

Paragraph E.2 of the Agreement, titled "Producer Royalty," governs compensation of the producers of recordings for the newly-created record label (the "Label").[12]  The plaintiffs

---

[11]We summarily reject the plaintiffs' additional argument that summary judgment was improper because the district court erroneously relied upon the "self-serving statements of Defendants' counsel," who testified that Machete and LT did not enter into the Profit Share Agreement with any intent to benefit the plaintiffs. As an initial matter, it is less than clear that the district court in fact relied upon this testimony, as it is nowhere cited in the summary judgment order.  In any event, however, our review of the Profit Share Agreement persuades us that summary judgment was proper even without this additional evidence.

[12]Paragraph E.2 provides in its entirety:

suggest that the first sentence of Paragraph E.2, which specifically names Rivera (professionally known as "Thilo") in a list of LT producers whose services LT must provide to the Label, evinces an intent to benefit at least Rivera. Moreover, the plaintiffs cite Paragraph E.2 to support their contention that "the Profit Sharing Agreement states it will pay sums certain to [t]he LT Producers." But Paragraph E.2 imposes no obligation on Machete to pay these royalties. Instead, it twice states that LT is responsible for the producers' compensation: "LT will be solely responsible for compensating the LT producers" and any other producers it engages, and again, "Any additional funding required for the LT producer services shall be provided directly and soley

LT and its Principal [Saldana] will also furnish the services of the producers known as the Underage, Tainy, Nales, A & A, and Thilo [Rivera] (the "LT Producers") to the Label, pursuant to work for hire agreements signed between LT and the LT Producers. The LT producers may work on projects outside of the Label so long as such work does not interfere with LT's delivery obligations hereunder and so long as Label projects are given priority over any outside projects. LT will be solely responsible for compensating the LT producers or engaging and compensating any other producers it may engage to assist with the recordings hereunder, including without limitation the producer services of the producer professionally known as Tunes [Cabrera]. Notwithstanding the foregoing, it is the intention of the parties that the LT producers shall be compensated on a flat fee basis of up to Two Thousand Dollars ($2,000.00) per track which will be taken from the relevant artist's authorized recording budget or a royalty of three percent (3%) if the artist agreement provides for an all-in royalty, to be decided on a case by case basis. Any additional funding required for the LT producer services shall be provided directly and soley [sic] by LT and or Principal.

-23-

[sic] by LT and or [Saldana]."  There is thus nothing in Paragraph E.2 that even establishes a duty on Machete's part inuring to the plaintiffs' benefit, much less an intent for the plaintiffs to benefit.  To the contrary, Paragraph E.2 makes clear that any such obligation rests with LT.

Paragraphs H and R of the Agreement also fail to support the plaintiffs' theory.[13]  Although the plaintiffs aver that Rivera "was entitled to a share of LT's profits stemming from this agreement" and "to royalties for his share of the P'Al [sic] Mundo CD" under these two paragraphs, neither paragraph creates any contractual obligation as to Rivera or any other plaintiff. Instead, these paragraphs govern LT's profits from the newly-

---

[13]Paragraph H.1, titled "Distribution of Profits," provides in pertinent part:

> Machete shall pay LT forty nine percent (49%) of the Label's Net Proceeds (the "LT Profit"), retaining the balance of Net Proceeds for Machete's own account.  "Net Proceeds" shall mean all income received from the exploitation of the Label's products throughout the Territory (including license income pursuant to paragraph F below) less [] aggregate costs and fees . . . .

Paragraph R in turn provides in pertinent part:

> In consideration of Principal's producer services in connection with the Masters embodied on the album "Pa'l Mundo" (the first "WY Album") embodying the performances of the artists Juan Luis Morera Luna and Llandel Vegilla Malave, collectively professionally known as Wisin and Yandel (hereinafter referred to as WY), Machete hereby grants to LT a participation of 25% of Machete's Net Proceeds pursuant to paragraph H, above, and a 25% ownership interest in such Masters, commencing on January 1, 2007 and with respect to sales after such date.

created Label and from the 2005 "Pa'l Mundo" CD and, therefore, do not evince any intent to benefit the plaintiffs.

The final provision of the Agreement upon which the plaintiffs rely is Paragraph K.2, titled "LT's Services."  It provides:

> LT will furnish the services of Principal and the LT Producers (provided that Principal shall be the sole or primary producer) to produce ten (10) recordings of various Machete artists (i.e., non Label artist's [sic]) upon Machete's request.  Machete will pay the applicable LT Producers an advance in the amount of Four Thousand Dollars ($4,000.00) upon Delivery of each such track to Machete and a royalty of up to 3% to be taken out of the artist royalty and recoupable from the aforementioned advance and recording budget. Such amounts shall be funded by Machete so long as they are within the maximum authorized A & R budgets set forth herein.  Otherwise LT shall fund such amounts.

Unlike the other paragraphs, this paragraph expressly contemplates the payment of royalties to the "LT Producers" (a group defined in Paragraph E.2 and including Rivera) by <u>Machete</u> rather than by LT. Nevertheless, it imposes no actual obligation on Machete's part to employ these producers on non-Label projects; instead, it requires LT to furnish the producers "upon Machete's request."

The plaintiffs have not alleged that the Erre XI songs were produced under this provision for a non-Label artist.  To the contrary, the parties do not dispute that the Erre XI artists were signed to the Label.  Reading the contract in its entirety as we must, and construing it "to give reasonable effect to each of its

-25-

provisions," J.A. Sullivan Corp. v. Commonwealth, 494 N.E.2d 374, 378 (Mass. 1986), we conclude that this case, involving Label recordings, is governed by Paragraph E.2 rather than K.2. As discussed above, that provision of the Agreement leaves LT "solely responsible" for producer royalties and thus offers no support for the plaintiffs' third-party beneficiary claim against the UMG defendants.

Apart from the text of the Profit Share Agreement, the plaintiffs also point to various items of extrinsic evidence in an effort to bolster their third-party beneficiary claims tied to the Agreement. We conclude, however, that this extratextual evidence -- an expert witness's written opinion interpreting the Agreement, deposition testimony of a Machete employee, a letter from Machete to LT alleging breach, and a series of internal emails in which UMG states that it will be administering mechanical royalties for the Erre XI album -- cannot be introduced to contradict the unambiguous language of the Agreement.

Under Massachusetts contract law, "extrinsic evidence may be used as an interpretive guide only after the judge or the court determines that the contract is ambiguous on its face or as applied." Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 908 (Mass. 2008); see also Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa, 388 F.3d 15, 20 (1st Cir. 2004) ("[E]xtrinsic evidence may be considered if language is ambiguous but not

otherwise (and whether language is ambiguous is a question for the judge)."). The plaintiffs fail to persuade us of any ambiguity in the language of Paragraph E.2 of the Agreement, which twice states that LT is solely responsible for the compensation of its producers. We therefore see no need to resort to extrinsic evidence in our interpretation of the Agreement.

Even if we were to do so, hewing to a more liberal approach under which extrinsic evidence may be considered "to demonstrate that a term is vague or ambiguous in the first place," Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995), our conclusion would remain the same. Of the four items of extrinsic evidence identified by the plaintiffs, two -- the Machete employee's deposition testimony and the letter from Machete to LT alleging breach -- concern only the contractual relationship between Machete and LT and seemingly have no relevance to the plaintiffs' contractual rights.[14] Although the plaintiffs cite their expert witness's opinion for the proposition that "payment of mechanical royalties by the label[] is a standard

---

[14]The deposed employee testified about a statement from Machete's president that Machete would not pay Saldana the money he was owed, and did not mention any money owed to the plaintiffs in this case. Similarly, although the plaintiffs claim that the letter from Machete to LT alleges breach on the part of LT's producers, it in fact only alleges a breach of LT's obligations under the Profit Share Agreement: it states in pertinent part that LT's producers have provided services on non-Label projects "that have materially interfered with the delivery obligations of LT's Benjamin as prohibited pursuant to Section E(2)" of the Profit Share Agreement.

-27-

practice," the expert's analysis focuses primarily on another section of the Agreement, Paragraph T, concerning which the plaintiffs raise only a cursory appellate argument. Moreover, although general industry practices may be helpful in <u>resolving</u> contractual ambiguities, <u>see</u>, <u>e.g.</u>, <u>C.A. Acquisition Newco, LLC</u> v. <u>DHL Express (USA), Inc.</u>, 696 F.3d 109, 114 (1st Cir. 2012), we do not think this testimony alone suffices to <u>create</u> an ambiguity in the plain language of Paragraph E.2. <u>See</u> <u>Smart</u>, 70 F.3d at 180 ("In no event may extrinsic evidence be employed to contradict explicit contract language or to drain an agreement's text of all content save ink and paper.").

As for the internal emails in which UMG states that it will be administering mechanical royalties for the Erre XI album, we think them too slender a reed to render the Agreement ambiguous as to the plaintiffs' status. Although these emails may indeed evince some obligation on the part of the UMG defendants, they were sent a year after Machete and LT signed the Profit Share Agreement and do not compel the conclusion that the <u>Agreement</u> was the origin of the defendants' obligation. We find these emails insufficient to impugn the plain language of Paragraph E.2, requiring LT to compensate its producers, and therefore conclude that the Profit Share Agreement imposed no duty on the UMG defendants to compensate the plaintiffs.

In a final effort to establish third-party beneficiary status, the plaintiffs suggest that they "gave consideration" for the Profit Share Agreement, focusing specifically on Rivera's renegotiation of his 2006 producer agreement in the wake of the Profit Share Agreement. Whether Rivera gave consideration for the Agreement to occur is a separate question, however, from whether he was an intended third-party beneficiary of the Agreement. Just as personal consideration on the part of a third party is not _necessary_ to establish third-party beneficiary status, _see_ 13 _Williston on Contracts_ § 37:28 (4th ed. 2013), so too is it not _sufficient_. Because the plaintiffs have failed to show that the Profit Share Agreement was intended for their benefit, their third-party beneficiary claims fail.

### 3.   **Miscellany**

Other argumentative riffs emerge intermittently from the plaintiffs' often dissonant briefing. The plaintiffs appear to have contended below that Paragraph T of the Profit Share Agreement, by transferring "[a]ll artist contracts owned or controlled by Mas Flow, LT, [or] any affiliated companies" to the new Label, constituted an assignment of LT's contractual duties to Machete. On appeal, however, they only dedicate a single sentence of their reply brief to this argument, stating merely that this paragraph "along with the other cited sections in plaintiffs' brief clearly demonstrate[s] evidence of an intention to benefit

-29-

plaintiffs."  With no further elaboration and no identified evidence contradicting the district court's conclusion that "only Gerry Capo Hernandez's contract was actually transferred to the Label under this provision, and [Capo] is no longer a Plaintiff in this case," we deem this cursory argument waived and do not assess its merit.  See Tower, 326 F.3d at 299; Zannino, 895 F.2d at 17.

We also reject the plaintiffs' claim that they are "joint authors of the disputed songs" and therefore entitled to "royalties, mechanical or otherwise" from Machete.  As discussed in section A.1 supra, these joint authorship allegations were insufficiently pleaded below and cannot now be developed for the first time on appeal.  So, too, with respect to the plaintiffs' embryonic theory that the "Label" created by the Profit Share Agreement was a partnership between Machete and LT and that the partners are therefore jointly liable to the plaintiffs.  The plaintiffs neither alleged such a partnership in their complaint nor raised this theory in their opposition to summary judgment below, and therefore cannot do so now.  See Iverson, 452 F.3d at 102; McCoy, 950 F.2d at 22.

### 4.  Motion for Reconsideration

Unlike their copyright claims, the plaintiffs do not allege that newly discovered evidence warranted reconsideration of their contract claims; instead, they claim that the district court's entry of summary judgment was based on a "manifest error of

law" and that the court therefore abused its discretion in denying their motion for reconsideration.  See FDIC v. World Univ. Inc., 978 F.2d 10, 16 (1st Cir. 1992) ("Motions under Rule 59(e) must either clearly establish a manifest error of law or must present newly discovered evidence.").  Because we have discerned no legal error, the district court did not abuse its discretion in denying the motion for reconsideration.

### C.    Lanham Act Claim

The plaintiffs next aver that the district court "failed to address the Lanham Act claims . . . apparently due to the Court's finding of no registration."  In fact, however, the district court's supposed oversight is susceptible to a more straightforward explanation.  Except for a single reference in the first paragraph (titled "Nature of the Action"), which describes the plaintiffs' suit as partially "a civil action for . . . false designation of origin under the Lanham Act," the plaintiffs' complaint neither lists a count under the Lanham Act nor makes any other allusion to a Lanham Act claim.  Nor do we find any mention of a Lanham Act claim in any of the plaintiffs' other district court filings save for a lone sentence in their March 2012 motion for reconsideration.[15]  The mere mention of a Lanham Act claim in the opening paragraph of the plaintiffs' complaint is not enough to

---

[15]The motion for reconsideration states, "Plaintiffs also properly pleaded a claim pursuant to the Lanham Act, which defendant has not addressed and should not have been dismissed."

make out such a claim as part of the plaintiffs' cause of action, cf. Coll, 642 F.3d at 901, let alone to set forth "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). We thus repeat what is by now a familiar leitmotif in this opinion: having failed to adequately raise this claim before the district court, the plaintiffs cannot now raise it on appeal. See Iverson, 452 F.3d at 102; McCoy, 950 F.2d at 22.

### D. Procedural Issues

On appeal, the plaintiffs also challenge the district court's adverse rulings on their motion for additional discovery and their motion to transfer the case to Puerto Rico. We review both rulings for abuse of discretion. See Ecker v. United States, 575 F.3d 70, 76 (1st Cir. 2009) (transfer); Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 91 (1st Cir. 1996) (additional discovery).

### 1. Motion for Additional Discovery

Not long after filing their opposition to the defendants' motion for summary judgment, the plaintiffs filed a motion under Fed. R. Civ. P. 56(d), seeking an extension of time in which to depose Machete's keeper of records and its former president. The district court denied this motion, following the tripartite

analysis set forth in <u>Rivera-Torres</u> v. <u>Rey-Hernández</u>, 502 F.3d 7, 10 (1st Cir. 2007):

> A litigant who seeks to invoke [Rule 56(d)] must act with due diligence to show that his predicament fits within its confines. To that end, the litigant must submit to the trial court an affidavit or other authoritative document showing (i) good cause for his inability to have discovered or marshalled the necessary facts earlier in the proceedings; (ii) a plausible basis for believing that additional facts probably exist and can be retrieved within a reasonable time; and (iii) an explanation of how those facts, if collected, will suffice to defeat the pending summary judgment motion.

In the district court's estimation, the plaintiffs failed both the first and third prongs.

We need not address the "good cause" prong, because the plaintiffs' appeal is easily resolved under the third prong. The plaintiffs have failed to show how the information to be obtained from the depositions would have defeated the defendants' motion for summary judgment. Although the plaintiffs now imply that the deposition testimony would be used for a number of purposes, their avowed purpose in the Rule 56(d) motion before the district court could hardly have been clearer: "[P]laintiffs do not wish to go on a fishing expedition, they merely wish to authenticate documents already produced." As the district court recognized, the defendants made clear in their opposition that they only challenged the authenticity of one of the four documents identified in the plaintiffs' motion. That document, apparently an August 2007

invoice from Mas Flow to Freddy Montalvo for ten songs not named in the plaintiffs' complaint, makes no reference to UMG or Machete. Even assuming the document's admissibility, the plaintiffs have furnished no explanation for how it would militate against summary judgment.

We therefore conclude that the district court acted well within the purview of its discretion in denying the plaintiffs' Rule 56(d) motion for additional discovery. Similarly, the district court did not abuse its discretion in denying the plaintiffs' motion for reconsideration on this issue, as that motion merely rehashed the plaintiffs' original argument and identified no legal or factual error warranting reconsideration. See $23,000 in U.S. Currency, 356 F.3d at 165 n.9 ("The repetition of previous arguments is not sufficient to prevail on a Rule 59(e) motion.").

## 2. Motion to Transfer

Also during the course of the summary judgment proceedings, the plaintiffs moved to transfer this case to the District of Puerto Rico and consolidate it with a parallel lawsuit that they had recently filed in that district.[16] The plaintiffs sought transfer of the entire case, including claims against the

---

[16]The Puerto Rico lawsuit, filed on August 12, 2011, was later dismissed due to the plaintiffs' failure to serve process within the 120-day term provided by Fed. R. Civ. P. 4(m). See Martinez-Alicea v. LT's Benjamin Records, Inc., No. 3:11-cv-01795-CCC (D.P.R. Jan. 13, 2012).

Daddy Yankee and LT defendants (no longer parties to this appeal) previously dismissed for lack of personal jurisdiction. The district court denied this motion in its summary judgment order, reasoning that it was too late for the plaintiffs to request transfer as to those defendants who had already obtained dismissal for want of personal jurisdiction. With respect to the UMG defendants, the court found no lack of jurisdiction and therefore concluded that transfer was inappropriate under 28 U.S.C. § 1631, which provides for transfer when "there is a want of jurisdiction" and transfer is "in the interest of justice."

We agree with the district court's conclusion. As there was manifestly no "want of jurisdiction" with respect to the UMG defendants (the only remaining defendants), transfer under § 1631 was inappropriate. See Subsalve USA Corp. v. Watson Mfg., Inc., 462 F.3d 41, 43 (1st Cir. 2006) (explaining that § 1631 "furnishes a court that lacks jurisdiction over an action with a choice between transfer and dismissal" (emphasis added)). Moreover, transfer of this case would in any event not be "in the interest of justice" given our conclusion that the district court did not err in granting summary judgment to the UMG defendants. Cf. Britell v. United States, 318 F.3d 70, 75 (1st Cir. 2003) ("[I]f an action or appeal is fanciful or frivolous, it is in the interest of justice to dismiss it rather than to keep it on life support (with the inevitable result that the transferee court will pull the

-35-

plug).").[17]  We therefore find no abuse of discretion in either the district court's denial of this motion or its subsequent denial of the plaintiffs' motion for reconsideration.  See $23,000 in U.S. Currency, 356 F.3d at 165 n.9.

### III.

For the foregoing reasons, we **affirm** the district court's orders granting the defendants' motion for summary judgment, denying the plaintiffs' motions for transfer and additional discovery, and denying the plaintiffs' motion for reconsideration.

---

[17]In light of the voluntary dismissal on appeal of the other defendants, over whom the district court concluded that it lacked personal jurisdiction, we need not address either of the two questions left unresolved in Cimon v. Gaffney, 401 F.3d 1 (1st Cir. 2005): whether § 1631 "provides for transfers only where a federal court lacks subject matter jurisdiction, or whether it also applies where other types of jurisdiction are lacking, including personal jurisdiction," id. at 7 n.21, and whether § 1631 permits "the transfer of some but not all claims in an action," id. at 7 n.20, so that the court could have transferred the claims against the other defendants but not the claims against the UMG defendants.